FILED

05/16/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0461

DA 20-0461

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 84

STATE OF MONTANA,

     Plaintiff and Appellee,

  v.

NICOLE ABENICIA NOLI,

     Defendant and Appellant.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Dawson, Cause No. DC-19-032
Honorable Olivia C. Rieger, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          Chad Wright, Appellate Defender, Jeavon C. Lang, Assistant Appellate
Defender, Missoula, Montana

     For Appellee:

          Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant
Attorney General, Helena, Montana

          Brett Irigoin, Dawson County Attorney, Glendive, Montana

Submitted on Briefs: October 12, 2022

Decided: May 16, 2023

Filed:

_____
Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1     Nicole Abenicia Noli appeals from her July 2020 convictions in the Montana Seventh Judicial District Court, Dawson County, on the offenses of felony criminal possession of dangerous drugs (methamphetamine) and misdemeanor criminal possession of drug paraphernalia.  She asserts that the District Court erroneously denied her motion to suppress the subject drug evidence discovered as the fruit of a warrantless investigative traffic violation stop.  She asserts that the investigating Montana Highway Patrol (MHP) trooper unlawfully sidetracked and prolonged an initially lawful lane violation traffic stop into an unrelated illegal drug possession investigation without additional objectively reasonable particularized suspicion that she was or was about to be engaged in illegal drug activity.  We address the following issue:

> *Whether the District Court erroneously concluded that the justification for the initial warrantless traffic violation stop ripened into a particularized suspicion of illegal drug activity within the lawful confines of the justification for the stop?*

We reverse.

## FACTUAL AND PROCEDURAL BACKROUND

¶2     On February 22, 2019, MHP Trooper Barry Kilpela (Trooper) was on patrol monitoring traffic from a stationary position in the median between the east and westbound lanes of Interstate 94 (I-94), about six miles outside of Glendive, Dawson County, Montana.[1]  At the time, the Trooper was accompanied by his trained drug-detection dog

---

[1] As pertinent here, I-94 is a four-lane interstate highway, with two eastbound lanes and two westbound lanes, running east-west between Billings, Montana, and the Montana-North Dakota border.

and was assigned to the MHP Eastern Montana Drug Interdiction Team. He was a seven-year MHP veteran with specialized training and experience in the field of illegal drug interdiction and was a certified drug-detection dog handler. At the subsequent suppression hearing in this matter, the Trooper testified that the mission and method of MHP Drug Interdiction Team members is to conduct:

> high volume traffic stops . . . . [W]e're trained on various different indicators and factors that we look at during the stop[s] [a]nd then . . . we combine that with . . . what the subjects say, the manner in which they say it, and the totality of all circumstances, to either dispel or . . . confirm, any suspicions that may arrive during that time. . . . We contact people a lot, a lot of days, every day, and [] then we look for various vehicle and subject indicators.

>                               .    .    .

> [W]hen it comes to criminal interdiction, [an indicator] can be a seemingly innocent thing in and of itself. But, [] when combined with either traffic patterns of your area, what the subjects say, and different things you see throughout the stop, and then of course, the officer's training and experience, it can lead them to reasonable suspicion [of illegal drug activity]. . . . So, like a subject indicator possibly could be . . . different physiological responses and their nervousness, their inability to [] directly answer questions, [] their breathing rate, and different things like that. Maybe conflicting stories . . . with one driver [] telling you one thing and a passenger is saying something else . . . could possibly be an indicator. And then, [a] physical indicator[] [regarding] the vehicle . . . could be . . . a third-party vehicle . . . or a rental vehicle that's used to kind of distance themself from the [suspected] criminal activity that's taking place.

The Trooper testified that he typically makes "700 or 800" stops a year in furtherance of his illegal drug interdiction mission and method. He candidly acknowledged at hearing, however, that such "indicators" "are not" necessarily indicative of "illegal" activity and "[c]ould [] all have innocent explanations."

3

¶3 On the day at issue, the Trooper saw a black Dodge Caravan mini-van traveling in the left lane (i.e., passing lane) of the two eastbound lanes on I-94. Seeing that it was not engaged in a passing maneuver, and that "no other vehicles were really close to it," the Trooper pursued the mini-van, activated his patrol car emergency lights, and stopped it on the dry, paved shoulder of I-94 for unlawfully driving in the left lane in violation of § 61-8-321(3)(a), MCA (vehicles must generally "be driven in the right-hand lane" on "all roadways having two or more lanes for traffic moving in the same direction"). On foot approach at the passenger side window, the Trooper encountered two adult females—the driver later identified as Noli and her passenger later identified as Noli's girlfriend. When the Trooper explained the reason for the stop, Noli immediately acknowledged the violation and explained that she was from Las Vegas, Nevada, and was thus not aware of that particular Montana law because driving in the left lane on a freeway is not illegal in Nevada.

¶4 As admitted into evidence at the suppression hearing, the audio-video recording made by the Trooper's front-facing patrol car dash camera system manifests that the Trooper then asked Noli for her vehicle registration and proof of insurance.[2] On ascertaining that the mini-van was a rental, he asked for her copy of the rental contract.[3] Noli produced the requested documents and then, approximately 40 seconds into the stop,

---

[2] The dash cam video system imprints an elapsed time counter on the resulting recording.

[3] The patrol car dash cam system apparently includes an integrated officer-worn body microphone for remote audio capture when the Trooper is out of the patrol car.

the Trooper told her that he would "give [her] a warning" for the left lane violation "as long as everything checks out."  But "make sure you're only using the left lane to pass, ok."

¶5     The Trooper later testified that he immediately suspected that the two women may be transporting illegal drugs in the mini-van.  He testified that the first suspicious thing he noticed was "a very strong" and "heavy odor of cigarette smoke coming from the vehicle" when he spoke with them at the passenger side window.  "Based on [his] training and experience," he asserted that heavy cigarette smoke was suspicious because cigarette smoking is "often used to mask the odors of drugs coming from the vehicle."  He testified that the next suspicious thing that he saw was that, when the driver reached across the center console and passenger to hand him the vehicle rental contract, "her whole arm seemed to be shaking."  He said that, when she "kind of braced it" or "rested it" on the console, he saw a small pack of cigarette rolling papers on the center console.  He testified that the rolling papers caused him to suspect marijuana use because "a lot of times rolling papers are used to smoke marijuana."  He testified further that Noli's shaking arm was suspicious because, even though "most people[] or a lot of people[] are nervous when they get stopped by the police," "her nervousness . . . seemed to be heightened compared to the average person."  He admitted, however, that he was "*not sure*" whether she put her arm down on the console merely to "brace" it or to "cover" the rolling papers from his view.  (Emphasis added.)  On cross-examination, he further conceded that rolling papers are also often used for smoking lawful substances, such as tobacco—they "can be used to . . . consume anything" "depend[ing] on what you put in [th]em."

5

¶6 He asserted that the fact that Noli was driving a rental car was also suspicious because it is "common for somebody that is [] trafficking drugs . . . to drive a rental vehicle." He explained:

> a lot of times rental vehicles . . . can be an indicator of drug trafficking and other criminal activity[] because . . . rental vehicles are new and they are reliable. But it, there's a number of other reasons . . . as well. If the smuggler or trafficker gets caught with a load of drugs and they're in a rental vehicle, then law enforcement does not try to forfeit the vehicle, cuz it belongs to the rental company, so they don't lose their own car. If you haul drugs in your own car, and the police seize it or impound it or forfeit[] it, you lose your car. If you do it in a rental car, [] you don't have to worry about losing your car. You're using somebody else's vehicle. And then, also, it[] distances themselves somewhat from anything in the car.

At the scene, upon examining the provided rental car contract document, the Trooper said that he would "try to look up" the rental car registration and insurance. He then directed Noli to "grab your [driver's] license and then you can just hop in my front seat of my car, [and] I'll fill you out a warning." When asked on cross-examination whether at that point he had particularized suspicion that Noli was involved in some type of illegal drug activity, the Trooper candidly answered, "[a]bsolutely not."

¶7 At hearing, he explained that he told Noli to join him in his car so that he could "easier" "fill out the appropriate enforcement action on [his patrol car] computer" and because he "think[s] it creates a better environment for everybody, and [he] can [then] talk to the people about the violation and their travels." In response to a leading question from the prosecutor, he also cited "safety concerns," to wit:

> [Then,] I don't have to stand . . . alongside a busy highway. And then, as well, the person that I stopped can come back and sit inside of [] a car. . . . This also, [] is nice cuz we can obviously if they're a driver, is not in the driver's seat of the vehicle [sic], they're not gonna be able to flee. Not gonna

6

[sic] be able to drive away. . . . We're able to separate them from the passengers. So, if there's multiple people in a vehicle, th- [sic] so they can't conspire or anything like that.

He did not explain, however, how it would be warmer or safer for a person, who is already safely sitting and waiting in the person's own warm vehicle for mere issuance of a traffic warning, to get out and walk along the highway in the cold to wait in a patrol car, and then have to again go back out in the cold and walk along the highway to return to his or her vehicle after receiving a simple traffic violation warning. Nor did he explain why, on a simple lane violation traffic stop, it was necessary to prevent Noli or her passenger from fleeing, or to "separate them" so they couldn't "conspire." On cross-examination, the Trooper acknowledged that having the driver "come back to [his] vehicle" on a traffic stop was not "necessary . . . to effectuate" issuance of a "traffic citation," it's just "something that I do." "I try to have dialog with pretty much anyone that I stop," and "when [] they come back to my patrol car, that's when the conversations usually begin." Consistent with his earlier description of the MHP Drug Interdiction Team methodology, the Trooper acknowledged on cross-examination that he commonly engages in "high volume [traffic] contacts looking for drugs" and "drug trafficking," and thus uses the unrelated traffic stop as an opportunity to engage the driver in conversation designed to develop additional information upon which to confirm any preliminary suspicion that the occupants may be transporting illegal drugs.

¶8 As he turned away from the passenger side window to walk back to his patrol car, the Trooper stopped, put his face and hands up to the rear window of the mini-van and searchingly peered into the backseat area before proceeding on. Meanwhile, Noli

7

compliantly exited on the driver's side, walked back and sat down in the front seat of the patrol car as directed, and then patiently waited for the Trooper to check her driver's license, rental car registration, and insurance and then issue her a left-lane violation warning as represented.

¶9 At the suppression hearing, the Trooper testified that, when he peered through the rear window of the mini-van, he saw some blankets or pillows, and some unspecified and unquantified "trash" in the backseat. He testified that those items were suspicious in his experience because they "*can be* indicative of . . . *hard travel*." (Emphasis added.) He explained that:

> *hard travel* is of note in a drug trafficking world because, usually when you're traveling long distances or things like that, especially if you have drugs, you're trying to get . . . [there] as quickly as possible. And oftentimes that may include sleeping in the vehicle or spending long periods of time . . . on the road. Cuz you're trying to get from Point A to Point B as quick as you can and spend as least amount of time on the road as you can, because then your chances, they believe, are [] less, I guess, of being caught by law enforcement.

(Emphasis added.) Based on his training and experience, he said that the fact that the two women were traveling from Las Vegas was further suspicious because:

> Las Vegas, Nevada[,] is a major source of illegal drugs[,] [e]specially methamphetamine. In fact, just the prior week before that happened, I stopped a vehicle driving from Las Vegas, Nevada, to the state of North Dakota and it ended up being a large quantity of methamphetamine that the driver of that traffic stop was hauling from Las Vegas.

He correspondingly noted that North Dakota is a common illegal drug "destination."

¶10 The rear-facing patrol car dash cam recording manifests that, after Noli sat down and was waiting in the patrol car as directed, the Trooper did not immediately call- or

type-in any request for verification of her driver's license, registration, wants/warrants, or vehicle status. Instead, he immediately began extensively questioning her regarding matters wholly unrelated to the observed left-lane violation or her driver's license, registration, wants/warrants, or vehicle status. *Inter alia*, he asked her about when she left Las Vegas and where they were going (answers: yesterday morning and "North Dakota"), where in North Dakota they were going (answer: "Willington," i.e., Williston), "what is that by" (answer: "I have no idea, [but] I know it's not too far in[to]" North Dakota),[4] for what purpose they were going there (answer: to pick up her two sisters and young nephew who were there with their dad), how long they would be there (Trooper: to "just pick 'em up and head back?"—answer: "yeah"), how the weather was along the way (answer: wintery—"we went into a snow blizzard [and] I couldn't see in front of us, that was scary"), and numerous other trip details. Noli said, "then we went through, ah, Idaho Falls," Idaho, "into, I think like, Wyoming," or wherever Google Maps "took us, ah, into the mountains, that was pretty scary because the roads were all icy, that was kinda scary so, but other than that it's been pretty good"). The dash cam recording indicates that the Trooper did not make or request common driver's license, vehicle registration, and wants/warrants/vehicle status checks until after he had been questioning Noli about unrelated matters for almost two minutes. The Trooper then asked whether they had been "driving straight through,

---

[4] Williston, North Dakota, is located approximately 98 miles northeast from the intersection of I-94 and Montana Highway 16 at Glendive, Montana. The most direct route to Williston from the subject traffic stop location was to proceed east approximately 6 miles to Glendive, then northeast from Glendive on Montana Highway 16 to Sidney, Montana, then northeast on Montana Highway 200 to its intersection with U.S. Highway 2, and then east on U.S. Highway 2 into Williston.

switching drivers," if and where they "spen[t] the night" along the way (answer: in a motel "right before Idaho Falls, so I don't know what little city that was," and then "we woke up this morning and came back up"), "how is your driving record" and "have you had any tickets" or been "arrested for anything" (answer: yes, in Las Vegas), and what (answer: "ah . . ., I had a DUI back in like 2012").

¶11 After the requested law enforcement database checks revealed no issues or problems, the Trooper subjected Noli to a new round of questioning regarding matters manifestly unrelated to the issuance of a traffic violation warning as represented. Pointing her to her vehicle ownership history that he had pulled up on his patrol car computer monitor, he asked whether she owned or had owned all of the listed vehicles, why she didn't drive her own car on the trip (answer: because she didn't want to put the extensive trip mileage on her own car, i.e., "I'm not taking that all the way out here [pauses, looks at Trooper, and smiles], yeah, so we rented a vehicle, [it's] a 19 hour drive, 20 hour drive"), how much sleep they had during the long drive from Las Vegas to Williston (Trooper: "you guys must have not got too much sleep, huh, if you rented [the mini-van] at 8:00 a.m. yesterday?"—answer: "yeah . . ., we got to the room at like 9:00-9:30" or "10:00 last night"). Non-sequitur, the Trooper then advised Noli to "make sure you get" her passenger "listed as a driver" on the rental car contract "if she drives" the rental car.

¶12 He then asked whether they were "going to spend the night" in North Dakota or drive "straight back" (answer: spend the night in a Williston "hotel/motel," start back tomorrow, and then probably rent another motel room tomorrow night) and what she "[did] for work" in Las Vegas (answer: "I was at Auto Zone" and then "I recently quit" and "now

10

I'm doing like on-call for security, I've done security prior in a [Las Vegas] casino, that was pretty cool"). Noli compliantly answered all questions asked.

¶13 The Trooper later testified that he viewed Noli's statement that they had been on the road for "a couple [of] days" as inconsistent with the fact that the rental contract indicated that she rented the mini-van in Las Vegas around 8:00 a.m. the day before. He explained that her "confusion" was an indication that she:

> was *maybe* experiencing *heightened stress* and was *being deceptive* at this time. Her mind seemed to be elsewhere rather than just . . . being able to answer a basic question such as, hey, when did you guys leave Las Vegas?

(Emphasis added.)

¶14 He testified that he also found suspicious what he characterized as Noli's lack of attention, inability to directly "answer simple questions," and extraordinary nervous behavior while in his patrol car. As the bases for those characterizations, he cited, *inter alia*, what he viewed as extraordinarily nervous behavior, pensive pauses, indefinite or indirect answers, and her choppy manner of speaking, to wit:

> she seemed to be, like, breathing heavily, like kinda through her stomach, short breaths, and I interpreted that as, you know, nervousness more so than most people that I come in contact with. And I also sh- [sic] her, she seemed to be totally avoiding eye contact with me, and her anxiety or stress seemed to kind of be heightened that she couldn't answer basic questions. And she just repeatedly would say I believe it was, uh, I think sh- [sic] what she would answer, saying something like, absolutely, or something like that, I ca- [sic] or definitely, that's what she would say. She'd say, I'd ask something, and she'd say, ["]definitely, definitely, definitely.["] I, bu- [sic] *I interpreted this behavior* and what she said as well as the places and short-term trip that she was going to is, I think she was being *deceptive* to me. When she was *trying to mask* any of the *nervousness and play it cool*.

. . .

11

> Ms. Noli's overall demeanor[,] . . . and her behavior, . . . especially the manner in which she would answer questions, and repeatedly saying, definitely, and trying to sp- [sic] *play it cool and the shallow breaths* and *avoiding almost any and all eye contact*, and you know, rubbing her face and things like that, that's a pretty heavy indicator, to me, that the person's being *deceptive* and *possibly* involved in additional criminal activity, other than just a traffic violation she was stopped for.

(Emphasis added.) He reiterated that those "indicators" were suspicious because they were:

> *sign*[*s*] [often] *of* what I see as *deception*, and [that] there's *something* that the person is *trying to hide or not tell me*. And her stress level seemed real[ly] high *for someone* that was *just receiving a warning for a left lane violation*.

(Emphasis added.)

¶15   After the extensive questioning regarding matters unrelated to the justification for the stop seemingly ceased, the Trooper asked Noli to verify her address and phone number for issuance of the written traffic warning. However, the unrelated questioning then resumed. *Inter alia*, the Trooper asked "who is up there" in North Dakota (answer: "my little sisters, I have two of them up there"), "who do they live with" and where/with whom they were "staying" (answer: they live/are staying with their father), and whether there was "enough room" for her and her passenger to stay at the home of her sisters' father instead of getting a motel room (answer: probably but they were going to stay at a motel). After next asking, apparently in regard to the written warning, whether Noli had "brown eyes," a fact plainly listed on her driver's license, the Trooper asked several unrelated questions *about her passenger* including, *inter alia*, "what is your relation to her" (answer: "my girlfriend"), "how long have you guys been together" (answer: "about a year"), "is she working" (answer: "ah, she's also security"), "still or not, not now" (answer: "she is,

12

yeah"), "what is this thing here, a Caravan" or "Grand Caravan" (answer: "yeah"), how much Noli paid to rent the mini-van "for a few days," and whether she would get her rental deposit back. Doubling-back, he again asked, "and then you're bringing her back with you, what is [she], your sister," "are you bringing multiple people back or just her," and "do you guys know how to get to where you're going." On cross-examination, the Trooper acknowledged that nearly all of the questions posed to Noli in his patrol car were unrelated to the issuance of a traffic violation warning. He asserted that they were merely questions asked *in* "*general conversation*" while he was completing his "[traffic] enforcement action." (Emphasis added.)

¶16    The Trooper then stated, "I gotta check the VIN number, here, on the vehicle [inaudible] get it returned," "you must be tired, how many hours have you been driving today," and "I gotta check the VIN number and then I'll give this" (i.e., the vehicle rental contract) "back up to her" (i.e., Noli's passenger). He explained at hearing that he needed to check the actual vehicle VIN plate against the rental contract to make sure that the rental company rented the correct vehicle to Noli. He did not explain, however, why it was necessary to ensure that the rental company's contract information was in order after his vehicle status database check on the rental indicated no registration or ownership issue or discrepancy. As he opened his patrol car door to get out, Noli asked if she should come along. The Trooper ignored the question and said only that he would "be right back." At that point, Noli had been patiently waiting in his patrol car for over 9 minutes while the Trooper extensively questioned her about a myriad of matters almost exclusively unrelated to the reason for the traffic stop.

13

¶17    After walking up to the driver's side of the mini-van and quickly glancing at the dashboard VIN plate, the Trooper walked around to the other side and began speaking with the passenger.  He handed her the rental contract and then warned, "just make sure you guys aren't driving in the left lane, ok, unless you're passing someone."  At hearing, he gave no explanation as to why it was necessary to warn *the passenger* about driving in the left lane, or to return the rental contract to her rather than simply giving it back to Noli when he returned her driver's license.  Revealing the true unrelated investigatory purpose of his return to the mini-van, he then asked the passenger a series of questions previously asked of and answered by Noli, "where're you, how far are you guys going to go" (answer: North Dakota), "what part" (answer: Williston), "how long are you gonna be up there for" (answer: "straight there" and "then right back"), "what's the reason for the trip then" (answer: inaudible), and "so you head up there [to Williston] and go back" (answer: "yep"). Unquestionably indicating the ulterior purpose of his extensive unrelated questioning, the Trooper then finally asked directly, "what all do you guys got for luggage then" (answer: "it's in the back"), "no, I said what do you have for luggage" (answer: "just a change of clothes"), "anything illegal in the car" (answer: no), and "*any issue with me searching the vehicle* today" (answer: no—"you'll have to ask her").  (Emphasis added.)  The Trooper acknowledged at hearing that he questioned the passenger in order to "confirm or dispel" his suspicion that the two women were involved in illegal drug activity.

¶18    The Trooper asserted at hearing that questioning the passenger revealed two additional suspicious facts indicative of the suspected illegal drug activity.  First, in contrast to Noli's statement that the couple would be staying overnight in Williston and then leave

14

to drive back to Las Vegas in the morning, he asserted that the passenger inconsistently told him that they were going to Williston to "pick[] up some people" and then "immediately turning around" to return to Las Vegas. He said that inconsistency was suspicious because it caused him to "believ[e] that one[] or both[] of them were *probably* not telling [him] the truth of what was going on." (Emphasis added.) He acknowledged on cross-examination, however, that he did not ask the passenger any follow-up questions to clarify whether she was in fact saying something different than Noli or not. Second, the Trooper asserted that, when he asked about "what they had for luggage in the vehicle," the passenger was suspiciously "avoiding eye contact" and "immediately began to put a cigarette in[to] her mouth," so she could "begin smoking to calm her nerves." He asserted that she then "lit the cigarette" and suspiciously "took a big, long drag off of it" in response to his asking whether "there was anything illegal in the car." The Trooper explained that this behavior was suspicious because *he*:

> *believe*[*d*] [it] was her way of *trying to cope with her nerves* at that time . . . [and that it is] very unusual . . . [for a] passenger [who] doesn't have anything to do with the traffic violation . . . [to act like that because,] *if there's not any additional criminal activity*, they have *no reason to be nervous or display any type of behavior like that*. . . . [W]hen I saw that type of behavior out of a passenger . . ., I suspected the two subjects were involved in additional criminal activity other than just driving in the left lane.

(Emphasis added.) He stated that, when he asked the passenger for consent to search the vehicle, she said "you'll have to ask the driver." The Trooper did not, however, acknowledge any correlation between the passenger's purported extraordinarily nervous reaction to his patently extraordinary questioning of an isolated passenger, in the context of a simple lane violation traffic stop, regarding various unrelated matters, whether there

15

was anything illegal in the vehicle, and whether *the passenger* had an issue with him searching their vehicle.

¶19 The Trooper testified that, with the addition of the passenger's responses and his observation of her suspicious "nervous" behavior, he then had particularized suspicion that the couple were engaged in illegal drug activity, i.e., that there were illegal drugs present in the vehicle. He testified that his asserted particularized suspicion was based on: (1) the "heavy masking odor of cigarette smoke" often used to conceal the odor of illegal drugs; (2) the presence of "rolling papers" often used to smoke marijuana; (3) the driver's attempt "to cover up" the rolling papers by "bracing her shaking arm on the center console"; (4) the indication of "hard travel" in a short-term rental vehicle as often associated with illegal drug trafficking; (5) the fact that the couple was "traveling from" an illegal drug "source area" to an illegal drug "destination area" with intent to return "almost immediately"; (6) the driver's extraordinarily nervous behavior (i.e., avoidance of eye contact, "shallow breaths," "elevated" "stress level," and inability "to answer simple questions") indicating "deception" and consciousness that she was "guilty" of something other than merely "traveling in the left lane" of the freeway; (7) the inconsistent statements of the driver and passenger as to whether they intended to stay the night in Williston or immediately return to Las Vegas; and (8) the passenger's unusually nervous "demeanor" in response to a general question about the contents of their luggage and whether there was anything illegal in the vehicle.

¶20 Upon returning to his patrol car after questioning the passenger, the Trooper sat down and, as he was unfolding/opening his patrol car laptop computer, oddly said, "ok, I

16

wonder why my printer is not working."[5]  He then asked Noli, "what all [do] you guys got for luggage in the vehicle" (answer: "um, just some clothes" and "got a couple blankets").  At hearing, he elaborated that when:

> she told me that they [were traveling with] clothes and blankets [in the vehicle,] . . . her *head* was *shaking back and forth* like she's saying no.  So, I *interpreted this as* [] *deceptive behavior* cuz she's telling me, I have, we have blankets and, uh, clothing in the car, but she's shaking her head no the whole time she's saying it.  I *interpretated that as* there was *something else in the vehicle*, other than just clothing and blankets.

(Emphasis added.)  The dash cam recording manifests that the Trooper then said "usually I would print this for ya but my printer's not working, so that's just for driving in the left lane, just a warning, ok."[6]  Noli responded "ok" and he said, "so as far as the traffic stop, you're good to go there, you got your stuff back, right."  Noli responded "yeah."

¶21    However, without pause and before Noli could even move to start to get out of the patrol car, the Trooper then immediately subjected her to yet another round of questioning regarding illegal drug activity, to wit:

> [Trooper]: And, can I ask you, is there anything illegal in the car today?
> [Noli]:      No.
> [Trooper]: Any marijuana?
> [Noli]:      No.
> [Trooper]: Any cocaine?
> [Noli]:      No.
> [Trooper]: Any methamphetamine, any heroin?
> [Noli]:      No.
> [Trooper]: Guns? Anything like that?

---

[5] The Trooper's statement was odd because he made the statement as he was opening his laptop without having placed his fingers on the keyboard in an attempt to activate it.

[6] The Trooper's dash cam recording manifests that his printer was working fine when he later used it to print out a vehicle search consent form for Noli's consideration.

17

[Noli]:    No.

[Trooper]: Do you have any issue with me searching the vehicle today?

[Noli]:    No.

[Trooper]: No problem?  Ok, then *I'll do that quick*, . . . ok?  Sound good?

[Noli]:    *Why are you going to search it*?

[Trooper]: Well, I just think it's a crazy trip, that's why I was just asking you if you had any problem with it and you said no.  Is that right?  Are you responsible for everything in the vehicle?  And, I'll tell you [that] *if you have* like a [*marijuana*] *joint* or something like that, *that's not what I'm looking for*. . . . Is that what's in the car, or what? . . . *If that's all* it is, *I'm not worried about a joint*.

[Noli]:    *I don't feel comfortable with you searching* the car, though.  I *don't understand why* you would have to search it.

[Trooper]: Just cuz what you guys are doing.  It's a quick trip and stuff like that, so, just something I do out here.  [Inaudible] all you have is a joint? . . . I'm asking you?

[Noli]:    No. . . . *I don't have a joint in there*.  I just *don't understand why* you would [interrupted by Trooper]

[Trooper]: I thought that's what you just told me?

[Noli]:    No.  I did say, you did, yes. . . . But I was just trying to question you about, to find out why you were gonna [interrupted by Trooper]

[Trooper]: No, no, I just think it's a quick trip and it's something I do out here, some things don't really make a lot of sense to me. . . . And so it's just something that I asked you.  But like I said, I'm not worried about a joint or something like that or a little bit of weed. . . . So, is there something more than that, or that's it?

[Noli]:    No, it was *just an open beer*.

[Trooper]: I'm not worried about an open beer.

[Noli]:    Ok, *then that's it*, no.

[Trooper]: Ok, so can I search the car or not?

[Noli]:    Yeah.

[Trooper]: Ok, then I can, ok, I'll have this, you understand why I'm asking you all this, what I just asked you?

[Noli]:    I do understand.

[Trooper]: Ok . . .[,] [a]re you responsible for everything else in the vehicle or was, did anybody give you something else that doesn't belong to you? . . . Hang on, just a second [printer sound].  So this, I have a *printout*, . . . . All this says is that you are giving me your *consent to search* this vehicle today.  Ok, and then if there is any illegal items, then I'm gonna take 'em. . . .  Does that make sense to you?

[Noli]:    It does, *but I don't understand why* though.

[Trooper]: [Inaudible] read it?  [Inaudible] *Why, do you not* like to *sign* forms?

18

[Noli]:     I do not, like, *it was a traffic violation. . . . It was a warning* that you were pulling me over for.

[Trooper]: Yeah, but you told me [pause] a couple of times that there was a joint in the car.  Now you tell me there's an open beer in the car.  What, I don't understand what you're saying anymore.

[Noli]:     The fact that *you're asking me to search my car when you're pulling me over for a warning.*

[Trooper]: Right, right, but what I'm saying is, I'm asking you, did you or did you not tell me there's a joint in the car?

[Noli]:     I did and *it was false*, yes.

[Trooper]: Did you or did you not tell me that there was an open container in the car?

[Noli]:     Yes.

[Trooper]: Ok, are either of those things in the car?

[Noli]:     Yes.

[Trooper]: One or both of them?

[Noli]:     One.

[Trooper]: Ok, *what is in the car?*

[Noli]:     The *beer*.

[Trooper]: Ok, . . . *I don't think that you're drunk or impaired right now. . . .* [S]o if there's an open container in the car, I am going to dump that out.

[Noli]:     Ok.

[Trooper]: But what I'm asking, the rest of the vehicle and everything in the vehicle, are you responsible for everything else in the vehicle?

[Noli]:     Yes.

[Trooper]: And *can I search* the rest of *the vehicle*?

[Noli]:     *Yes*.

[Trooper]: I can?

[Noli]:     Yes.

[Trooper]: Ok, so what this says is that you are offering your consent for me to search this vehicle today and if there's any illegal items in the vehicle, then I am going to seize said items.

[Noli]:     Ok.

[Trooper]: So what I'm asking you, *do you want to sign this* that gives your *consent*?

[Noli]:     *No, I don't want to* sign it.

[Trooper]: Ok, but I understand you right that *I can search your vehicle* and you're *giving me your verbal consent* to search the car, yes or no?

[Noli]:     *No.*

[Trooper]: So, can I, or can I not, search the car?

[Noli]:     *No.*

[Trooper]: Ok, so what I am going to do is, I am going to, [the passenger] is going to get out of the car and then *I'm gonna deploy my narcotics-detecting dog* around the car [interrupted by Noli]

19

[Noli]: *You can search* the car. *If you're gonna do all that*, go ahead and search the car.

[Trooper]: Well, . . . I don't want you to feel that I'm coercing you [interrupted by Noli]

[Noli]: I understand, I'll sign it, that's fine.

[Trooper]: You don't have to sign it if you don't want to. But I just want to make sure you understand what I'm, cause you're, we're kind of going around and around in circles [interrupted by Noli]

[Noli]: Right, I understand.

[Trooper]: So, I'm simply asking you, *can I*, with your consent, *search this vehicle* that you're driving today for any and all contraband, including marijuana, cocaine, methamphetamine, or heroin?

[Noli]: Yes.

.   .   .

[Trooper]: And you understand that you do not have to give that consent?

[Noli]: Right.

[Trooper]: So what this says is, like I explained, ok, this is, we are in the county, Dawson County, ok, that is me. Ok, and I'm asking to search this vehicle and remove any of the illegal items that I may find in the vehicle, ok, and the rest of it is all explained there. So, *do you want to sign this form* or not? If you do not want to, you don't have to.

[Noli]: *What's* going to be *the difference* if I do or not?

[Trooper]: If you sign this?

[Noli]: Yeah.

[Trooper]: This is called a written consent, . . . meaning that you have read this and then you're still good with the search.

[Noli]: Ok.

[Trooper]: [Do] you want to read it or have you? Can you see it?

[Noli]: I don't know.

[Trooper]: Ok, so I'll put this away . . ., [but] you are good with me searching this vehicle?

[Noli]: Yeah.

[Trooper]: Ok.

(Emphasis added.) Over 20 minutes after the initial stop, Noli finally acquiesced and gave him unequivocal verbal consent for the requested vehicle search.

¶22 Upon searching the vehicle, and containers located therein, the Trooper found, as pertinent, an open alcoholic beverage container, a plastic bag containing 13 grams of

20

suspected methamphetamine, some empty plastic bags with suspected marijuana residue, two scales commonly used to weigh illegal drugs, and pill bottles containing 14 unidentified pills. The Trooper then arrested Noli and took her to jail. The State ultimately charged her by Information with felony possession of dangerous drugs (methamphetamine) and misdemeanor possession of drug paraphernalia.

¶23 Noli later filed a motion for suppression of all evidence found in the vehicle search based on her assertion that it was the direct result of an unlawfully prolonged warrantless seizure of her person, i.e., an unlawfully expanded and prolonged traffic stop. She asserted that her eventual acquiescent consent to the search resulted from the Trooper's unlawful expansion of the scope and duration of the traffic stop from a traffic offense warning to an illegal drug possession investigation without objectively reasonable particularized suspicion of such additional criminal activity. Based on the Trooper's hearing testimony, and the front-facing and rear-facing dash cam recordings admitted into evidence, the District Court denied the motion to suppress, however, based on the following reasoning:

> [Noli] was unable to identify the location she had stayed the night before, thought she maybe went through the mountains of Wyoming on the trip but was not sure, she obtained a two day rental of a vehicle that was due back to Las Vegas, Nevada; her version of the events did not match up with the passenger regarding the time that would be spent in "Willington" and her nervous mannerisms (rubbing face, avoiding eye contact, shaking, escalated breathing); her deceptive actions; escalating stress throughout the encounter even after being told she would receive a warning; the signs of travel in the vehicle (blankets, pillows, [and her] indicati[on] she was tired) led [the] Trooper [] to believe that criminal activity was afoot.
>
> .   .   .
>
> [The] Trooper . . . [suspected that other] criminal activity [was] afoot . . . [based] on the totality of what he physically saw, the things he smelled, the

21

things that [Noli] said to him, and the manner in which those things were said. The circumstances presented, coupled with the training and experience of the Trooper, indicate[d] that [she] was engaged in [other illegal] activity.

Noli subsequently entered into a plea agreement with the State under which she pled guilty to the charged offenses in return for a jointly-recommended probationary sentence and reservation of her right to appeal the adverse suppression ruling. The District Court accordingly imposed a three-year deferred imposition of sentence on the felony, a suspended six-month jail term on the misdemeanor, and related fines, fees, and probation conditions. Noli timely appeals.

## STANDARD OF REVIEW

¶24 The standard of review of a lower court denial of a motion to suppress evidence in a criminal case is whether the court's pertinent findings of fact are clearly erroneously and whether it correctly interpreted and applied the applicable law to those facts. *State v. Hoover*, 2017 MT 236, ¶ 12, 388 Mont. 533, 402 P.3d 1224 (citations omitted). Lower court findings of fact are clearly erroneous if not supported by substantial evidence, the court misapprehended the effect of the evidence, or upon our independent review of the record we are firmly convinced that the court was otherwise mistaken. *Hoover*, ¶ 12 (citation omitted). Whether a lower court correctly interpreted and applied the pertinent law to the facts at issue is a question of law subject to de novo review. *Hoover*, ¶ 12 (citation omitted).

## DISCUSSION

¶25 *Whether the District Court erroneously concluded that the justification for the initial warrantless traffic violation stop ripened into a particularized suspicion of illegal drug activity within the lawful confines of the justification for the stop?*

22

¶26 The Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution similarly guarantee people the right to be free from "unreasonable searches and seizures" of their "persons, houses, papers, and effects." U.S. Const. amend. IV;[7] Mont. Const. art. II, § 11. As procedural components of those protections, government searches and seizures are generally constitutionally unreasonable, and thus unlawful, unless conducted in accordance with a judicial warrant issued on probable cause. *Hoover*, ¶ 14 (citations omitted); *see also* U.S. Const. amend. IV ("no Warrants" for search or seizure "shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized") and Mont. Const. art. II, § 11 ("[n]o warrant to search any place, or seize any person or thing shall issue . . . without probable cause"). The fundamental purpose of the Fourth Amendment and Article II, Section 11 is to "protect the privacy and security of individuals from unreasonable government intrusion or interference." *Hoover*, ¶ 14 (internal punctuation and citations omitted). *Accord United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 96 S. Ct. 3074, 3081 (1976); *Schmerber v. California*, 384 U.S. 757, 767, 86 S. Ct. 1826, 1834 (1966).

¶27 As referenced in the Fourth Amendment and Article II, Section 11, a "search" is a means employed by government agents of gathering items of evidence or information which "substantially infringes or intrudes into or upon one's home, person, or other area

___

[7] The Fourth Amendment applies to the States through the Fourteenth Amendment's Due Process Clause. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691 (1961).

or thing in regard to which he or she has a reasonable expectation of privacy." *State v. Zeimer*, 2022 MT 96, ¶ 24, 408 Mont. 433, 510 P.3d 100 (citations omitted). As pertinent here, a constitutional "seizure" is "government action that deprives an individual of dominion over his or her person or property." *Zeimer*, ¶ 24 (internal punctuation and citation omitted). A person is constitutionally "seized" if "a government officer in some way restrains [the] person's liberty," however briefly, "by means of physical force" or exercise or "show of authority" which "under the totality of the circumstances[] would cause an objectively reasonable person to feel not free to leave the presence of the government officer." *Hoover*, ¶ 15 (internal punctuation and citations omitted).

¶28 Apart from the privacy protection implicit in the Fourth Amendment and similar language of Article II, Section 11, the Montana Constitution specifically protects "individual privacy" from government intrusion absent "showing of a compelling state interest." Mont. Const. art. II, § 10. While we have recognized that it does not provide any "new or heightened level of protection for any particular privacy interest" beyond those traditionally protected under the Fourth Amendment and Article II, Section 11 search and seizure protections, the express Article II, Section 10 privacy protection is nonetheless "broader in the sense that," in addition to the protection of privacy in a person's home and things as referenced in the Fourth Amendment and Article II, Section 11, the express Article II, Section 10 protection further "encompasses" both privacy in "information and activities." *State v. Nelson*, 283 Mont. 231, 242-43, 941 P.2d 441, 448-49 (1997) (noting, for example, Fourth Amendment protection of the sanctity of persons, homes, and effects and broader Article II, Section 10 protection encompassing both "autonomy privacy" and

24

"informational privacy").  In the context of the search and seizure protections provided by the Fourth Amendment and similar provisions of Article II, Section 11, we have also applied the express protection provided by Article II, Section 10 to "recognize[] a broader range" of expectations of privacy that are objectively reasonable in society than recognized under the Fourth Amendment, thus resulting in corresponding recognition of a range of warrant and probable cause exceptions to Article II, Section 11 that is somewhat narrower than those recognized under the Fourth Amendment.  *State v. Peoples*, 2022 MT 4, ¶ 13, 407 Mont. 84, 502 P.3d 129 (citations omitted).  Similar to the threshold test for whether a constitutional "search" occurs under the Fourth Amendment and Article II, Section 11, the broader Article II, Section 10 privacy protection is implicated when the government action at issue infringes or intrudes upon a person's subjective expectation of privacy that is objectively reasonable in society under the totality of the circumstances.  *State v. Staker*, 2021 MT 151, ¶ 11, 404 Mont. 307, 489 P.3d 489 (citations omitted).  When implicated in a particular case, we construe the Article II, Section 11 protection against unreasonable searches and seizures in accordance with the greater range of privacy protection provided by Article II, Section 10.  *Peoples*, ¶ 13 (citations omitted).

A.  Investigative "Terry" Stop Standards.

¶29    However brief, investigative stops of persons by police, including traffic or vehicle stops, are constitutional "seizures" subject to the warrant and probable cause requirements of the Fourth Amendment and Article II, Section 11.  *Hoover*, ¶ 15 (citation omitted); *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 694 (1981).  Unless "conducted in strict accordance" with one of "certain recognized and narrowly limited exceptions" to

25

the Fourth Amendment and Article II, Sections 10-11 warrant and probable cause requirements, warrantless searches and seizures are *per se* unreasonable and thus unlawful. *Zeimer*, ¶¶ 25-26 and 32 (citations omitted); *Hoover*, ¶ 14 (citations omitted).[8] Because warrantless searches and seizures are presumed constitutionally unreasonable, and thus unlawful, the State has the burden of affirmatively showing on challenge that the subject search or seizure was conducted *in strict accordance with* an applicable recognized exception to the warrant and probable cause requirements of the Fourth Amendment and Article II, Section 11, and as pertinent in a particular case, the broader privacy protection provided by Article II, Section 10. *Zeimer*, ¶ 26 (citing *State v. Goetz*, 2008 MT 296, ¶ 40, 345 Mont. 421, 191 P.3d 489); *Hoover*, ¶ 17 n.5 (citations omitted).

¶30 As pertinent here, a temporary investigative stop, or *Terry* stop, is a recognized exception to the Fourth Amendment and Article II, Section 11 warrant and probable cause requirements. *Hoover*, ¶ 17 (citations omitted); *State v. Gopher*, 193 Mont. 189, 192-94, 631 P.2d 293, 295-96 (1981) (recognizing and applying temporary investigative stop exception first enunciated in *Terry v. Ohio*, 392 U.S. 1, 15-16, 88 S. Ct. 1868, 1876-77 (1968), and further developed in *Cortez*); *Cortez*, 449 U.S. at 417-22, 101 S. Ct. at 694-97); *Terry*, 392 U.S. at 15-16, 88 S. Ct. at 1876-77. Under this narrow exception, "a law enforcement officer may stop and temporarily detain a person for investigative purposes without probable cause for an arrest if, based on *specific and articulable [objective] facts*

---

[8] *See also State v. Laster*, 2021 MT 269, ¶ 35, 406 Mont. 60, 497 P.3d 224 (in re "exclusionary rule"/"fruit of the poisonous tree" doctrine generally rendering inadmissible in subsequent proceedings evidence obtained as a result of constitutionally invalid search or seizure—citations omitted).

known to the officer," including reasonable inferences made by the officer thereon, that he or she has an *objectively reasonable suspicion* that the particular subject is or is about to be *engaged in criminal activity*. *Hoover*, ¶ 17 (original emphasis and citations omitted); *Gopher*, 193 Mont. at 192-94, 631 P.2d at 295-96; *Cortez*, 449 U.S. at 417-22, 101 S. Ct. at 695-97. The "demand for specificity in the information upon which police action is predicated" is the central requirement of the investigative *Terry* stop exception to the Fourth Amendment warrant and probable cause requirements. *See Terry*, 392 U.S. at 21 n.18, 88 S. Ct. at 1880 n.18. "Relevant considerations include," *inter alia*, the "quantity, substance, quality, and degree of reliability of information known to the officer" at the time. *Hoover*, ¶ 17 (citing *State v. Pratt*, 286 Mont. 156, 161, 951 P.2d 37, 40 (1997); *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416 (1990)). A warrantless traffic stop is generally a seizure of a vehicle, the driver, and any passengers for temporary investigative purposes and thus must be conducted by police in strict accordance with the limitations of the temporary investigative stop exception. *See Zeimer*, ¶¶ 26-32 (citations omitted); *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 1614 (2015); *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396 (1979); *Cortez*, 449 U.S. at 417-22, 101 S. Ct. at 694-97; *United States v. Nault*, 41 F.4th 1073, 1077-78 (9th Cir. 2022) (citations omitted).

¶31    On subsequent challenge, the State has the burden of affirmatively proving and demonstrating that the subject officer(s) had the requisite particularized suspicion of criminal activity based on specific and articulable objective facts known to, and reasonable inferences made by, the officer(s) under the totality of the circumstances of record.

27

*Hoover*, ¶ 17 n.5 (citations omitted); *Gopher*, 193 Mont. at 194, 631 P.2d at 296 (applying *Cortez*). The reviewing court must assess the sufficiency of the officer's asserted justification and rationale for the stop and its related duration and scope based on "common[]sense" "probabilities," rather than "hard certainties," from the perspective of "those versed in the field of law enforcement" rather than "in terms of library analysis by scholars." *Cortez*, 449 U.S. at 418, 101 S. Ct. at 695. However, any specialized law enforcement-specific inferences drawn from the articulated objective facts must themselves still be *objectively reasonable* under the totality of the circumstances. *See Hoover*, ¶ 17 (citations omitted); *Gopher*, 193 Mont. at 192 and 194, 631 P.2d at 295-96 (applying *Cortez*); *Cortez*, 449 U.S. at 418 and 421-22, 101 S. Ct. at 695 and 697.[9] The *Terry* "particularized suspicion standard does not require that an officer be certain, or even ultimately correct, that [the subject] is engaged in" the suspected criminal activity. *Hoover*, ¶ 18 (citations omitted). It does require, however, that the officer articulate "more than [a] mere generalized suspicion" or "undeveloped hunch of criminal activity." *Hoover*, ¶ 18 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S. Ct. 673, 676 (2000), and *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883).

---

[9] The *Terry* investigative stop exception, as further developed in *Cortez*, is codified in Montana at §§ 46-5-401 and -403, MCA (authorizing temporary stop of a person "to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person" upon observing the person "in circumstances that create a particularized suspicion that the person . . . has committed, is committing, or is about to commit an offense"). *See State v. Bar-Jonah*, 2004 MT 344, ¶ 42, 324 Mont. 278, 102 P.3d 1229 (noting Montana codification of constitutional principles); Comments of Commission on Criminal Procedure §§ 20.01-20.03 (Jan. 10, 1989), File No. 88-559, in the collection of the Clerk of the Montana Supreme Court.

¶32 In that regard, we have recognized that, depending on the case-specific circumstances, "otherwise perfectly legal or innocuous conduct or behavior *may* be a *contributing* factor in giving rise to a particularized suspicion of criminal activity *in conjunction with* other specific indicia of criminal activity." *Zeimer*, ¶ 50 (emphasis added—citations omitted). However, in the absence of some specific officer-articulated facts or inferences that are *objectively* indicative of some particular criminal activity, merely inconsistent accounts of a person's conduct, presence, or plans, unusually nervous or defensive behavior when monitored, stopped, confronted, or questioned by police, failure to make or maintain eye contact with police, use of a borrowed or rented vehicle, a messy, cluttered, or disheveled vehicle interior, presence at the scene of a crime, use of a highway commonly used for drug trafficking or other illegal activity, traveling to or from a city or area generally known as a source, destination, or situs of/for illegal drugs or other illegal contraband or activity, the desire to avoid contact with police, or other perfectly legal or innocuous conduct, behavior, or possessions are insufficient alone, whether individually or collectively, to support an *objectively reasonable particularized* suspicion of criminal activity. *Zeimer*, ¶ 50 (citations and parentheticals omitted). "When the only bas[es] for suspecting a specific person of wrongdoing [are] inferences that could be drawn from the conduct of virtually any law-abiding person, the resulting suspicion cannot, by definition, be particularized," but rather is more akin to mere generalized suspicion or an "inarticulable hunch[]" of criminal activity. *State v. Reeves*, 2019 MT 151, ¶ 13, 396 Mont. 230, 444 P.3d 394 (noting that drawing "inferences of nefariousness" from no more than

inarticulable hunches "subject[s] drivers to the perils of profiling and other impermissible motives for initiating traffic stops").

B. Limited Duration/Scope of Lawful Investigative Stop – Expansion on Development of New Particularized Suspicion of Other Criminal Activity.

¶33 Even when justified on particularized suspicion of criminal activity, the investigative stop exception permits no more than a *reasonably brief* interference with personal liberty, and *limited intrusion* into the personal privacy, of the subject in reasonable relation to the particularized suspicion that justified the stop. *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325-26 (1983) (*Terry* stop exception permits only a "limited intrusion on the personal security of the [subject]"—officer must "employ[ ] . . . the least intrusive means reasonably available to verify or dispel" the predicate particularized suspicion "in a short period of time"); *Terry*, 392 U.S. at 18-20, 88 S. Ct. at 1878-79 (investigative stop must be "reasonably related in scope to the circumstances which justified the interference in the first place"—internal punctuation and citations omitted). A "seizure that is lawful at its inception" becomes unlawful "if its manner of execution unreasonably infringes interests protected by the [Fourth Amendment]," *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 837 (2005), "by virtue of its intolerable intensity and scope." *Terry*, 392 U.S. at 18, 88 S. Ct. at 1878. For example, as pertinent here, a "seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407, 125 S. Ct. at 837. *Accord Rodriguez*, 575 U.S. at 354, 135 S. Ct. at 1614. Police must therefore act with reasonable diligence to quickly

30

confirm or dispel the particularized suspicion of criminal activity that justified the initial stop, and any subsequent expansion in duration or investigative inquiry based on new or additional particularized suspicion of other criminal activity developed within the lawful scope or duration of the initial stop. *Zeimer*, ¶ 29 (citing, *inter alia*, *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575 (1985); *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26 (duration and scope of an investigative stop must be carefully limited to its "underlying justification" and the "investigative detention must be temporary and last no longer than is necessary to effectuate the purpose [that justified] the stop"); *Terry*, 392 U.S. at 18-20, 88 S. Ct. at 1878-79 (scope and duration of the stop "must be strictly tied to and justified by the circumstances which rendered its initiation permissible"—internal punctuation and citations omitted)).   On a valid traffic violation stop, "the tolerable duration of police inquir[y]" is thus limited to the justified purpose or mission of the stop: "to address the [subject] traffic violation that warranted the stop and attend to [any] related safety concerns."  *Rodriguez*, 575 U.S. at 354, 135 S. Ct. at 1614 (internal punctuation and citations omitted).   "Because addressing the infraction is the purpose of the stop," the stop "may last no longer than is necessary to effectuate that purpose."  *Rodriguez*, 575 U.S. at 354, 135 S. Ct. at 1614 (internal punctuation and citations omitted).  *See similarly Caballes*, 543 U.S. at 407, 125 S. Ct. at 837.  "Authority for the seizure thus ends when tasks tied to the traffic infraction *are*—or *reasonably should have been*—*completed*."  *Rodriguez*, 575 U.S. at 354, 135 S. Ct. at 1614 (citation omitted—emphasis added).  On subsequent judicial review, the question is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel" the particularized suspicion, purpose, or mission of the

31

stop "quickly" without unnecessary delay. *Sharpe*, 470 U.S. at 686, 105 S. Ct. at 1575; *see Rodriguez*, 575 U.S. at 354, 135 S. Ct. at 1614; *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; *Terry*, 392 U.S. at 18-20, 88 S. Ct. at 1878-79.[10]

¶34    In that regard, upon a lawful investigatory traffic stop, police may generally request identification, and/or any available proof of identification, of the subject of the particularized suspicion, his or her present address, and "an explanation of the person's actions" regarding the particularized suspicion that justified the stop.  Section 46-5-401(1)-(2), MCA; *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185-86, 124 S. Ct. 2451, 2457-58 (2004); *Hayes v. Florida*, 470 U.S. 811, 816, 105 S. Ct. 1643, 1647 (1985); *United States v. Hensley*, 469 U.S. 221, 229, 105 S. Ct. 675, 680 (1985).  The officer may also attempt to verify information provided by the subject, and ask for other related information, as long as the additional inquiry is both reasonably related in scope to the particularized suspicion and purpose that justified the stop and does not unreasonably prolong its duration under the totality of the circumstances at issue.  *Michigan v. Summers*, 452 U.S. 692, 700 n.12, 101 S. Ct. 2587, 2593 n.12 (1981) (discussing various "investigative techniques which may be utilized effectively in the course of a *Terry*-type stop"—internal punctuation and citation omitted); *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; *Terry*, 392 U.S. at

---

[10] The fact that the officer could have accomplished or completed the predicate purpose of the stop by some other means that was quicker or less intrusive does not alone render the duration or scope of the stop unreasonable if the failure to use the less intrusive means was reasonable under the totality of the circumstances at issue. *United States v. Sharpe*, 470 U.S. 675, 687, 105 S. Ct. 1568, 1576 (1985) (citations omitted).

18-20, 88 S. Ct. at 1878-79.[11]    Moreover, in furtherance of government's generally compelling interest in highway safety regulation, routine police database checks (i.e., checks for outstanding wants/warrants, driver's license and vehicle registration status, and stolen/missing vehicle reports) are "ordinary inquiries incident to" lawful investigative traffic stops and thus permissible as long as conducted in a reasonably quick and diligent manner. *Rodriguez*, 575 U.S. at 350 and 354-57, 135 S. Ct. at 1612 and 1614-16 (citations omitted). *See similarly* § 46-5-401(1)-(2), MCA (on valid traffic stop officer may demand the driver's operating license and proof of vehicle registration and insurance).    Such reasonably brief inquiries are thus encompassed within the lawful purpose and mission of a valid traffic stop. *See Rodriguez*, 575 U.S. at 350-51 and 354-57, 135 S. Ct. at 1612 and 1614-16.

¶35    If "based on additional specific and articulable facts observed or discovered during the lawful scope and duration of the initial stop," police may also "lawfully expand or prolong the scope or duration of an investigative stop beyond its initial justification upon development of a new or expanded particularized suspicion of criminal activity." *Zeimer*, ¶ 30 (citing *Hulse v. Mont. Dep't of Justice Motor Veh. Div.*, 1998 MT 108, ¶¶ 40-42, 289

---

[11] *See similarly Hoover*, ¶ 23 (*within the limits of constitutional reasonableness*, the compelling government interest in effective law enforcement demands that officers in the field have reasonable latitude to reach, follow up on, and confirm or dispel the particularized suspicion of criminal activity that lawfully justified an initial or extended investigative stop—citing *State v. Sharp*, 217 Mont. 40, 47, 702 P.2d 959, 963 (1985)). However, "the mere fact that law enforcement may be made more efficient can never by itself justify disregard" of constitutional protections against unreasonable searches and seizures—"investigation of crime would always be simplified" and more efficient if constitutional warrant and probable cause requirements, and strict compliance with their narrowly recognized exceptions, were not necessary. *Mincey v. Arizona*, 437 U.S. 385, 390 and 393, 98 S. Ct. 2408, 2412 and 2414 (1978).

33

Mont. 1, 961 P.2d 75; *State v. Sharp*, 217 Mont. 40, 46, 702 P.2d 959, 963 (1985)). But, an investigative stop cannot lawfully ripen into new or additional particularized suspicion of criminal activity justifying expansion of the scope or duration of the initial stop unless the officer observed or acquired the new or additional objective indicia of other criminal activity, and formed an objectively reasonable new or additional particularized suspicion, *before* he or she dispelled or completed, or reasonably should have dispelled or completed, the initial particularized suspicion, purpose, or mission with reasonable diligence and without unnecessary delay. *Hoover*, ¶ 23 (citing *Hulse*, ¶¶ 40-42); *Rodriguez*, 575 U.S. at 354, 135 S. Ct. at 1614.[12] At the point that the officer has "dispelled the predicate particularized suspicion that justified the initial stop within its lawful scope and duration," "failed to observe or discover additional specific and articulable facts justifying expansion of the scope or duration of the stop based on a new or expanded particularized suspicion of criminal activity," and completed or reasonably should have completed the valid purpose or mission of the stop, "the stop must end without further delay." *Zeimer*, ¶ 31 (citations omitted); *State v. Meza*, 2006 MT 210, ¶ 23, 333 Mont. 305, 143 P.3d 422; *Rodriguez*, 575 U.S. at 354, 135 S. Ct. at 1614; *United States v. Brignoni-Ponce*, 422 U.S. 873, 882, 95 S. Ct. 2574, 2580 (1975). In turn, like the limited scope and duration of the initial valid stop,

---

[12] *See similarly* § 46-5-403, MCA (investigative stop "may not last longer than is necessary to effectuate the purpose of the stop"); *State v. Meza*, 2006 MT 210, ¶ 23, 333 Mont. 305, 143 P.3d 422; *State v. Martinez*, 2003 MT 65, ¶ 29, 314 Mont. 434, 67 P.3d 207; *Hulse*, ¶¶ 40-42 (citing *Terry*, 392 U.S. at 21-22 and 29, 88 S. Ct. at 1879-81 and 1883-84); *Sharpe*, 470 U.S. at 686, 105 S. Ct. at 1575; *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325; *Terry*, 392 U.S. at 19-20, 88 S. Ct. at 1879.

the scope and duration of investigation of any new or additional particularized suspicion of criminal activity that arose during the lawful scope and duration of the initial stop may not exceed that reasonably necessary to confirm or dispel that new or expanded suspicion and complete the purpose or mission of the extended stop. *Zeimer*, ¶ 30 (citing *Hulse*, ¶ 40; *State v. Martinez*, 2003 MT 65, ¶¶ 27-29, 314 Mont. 434, 67 P.3d 207; *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; and *Terry*, 392 U.S. at 19-20, 88 S. Ct. at 1878-79).

¶36    While not *per se* unreasonable under the Fourth Amendment and Montana Constitution Article II, Sections 10-11, incidental police questioning of the driver or any occupant(s) of the subject vehicle and supplemental vehicle inspection for the purpose of detecting or investigating *other* criminal activity *unrelated to* the particular purpose that justified the stop is constitutionally permissible only if and to the extent that the unrelated inquiry does not infringe or intrude upon the privacy or security of the subject, or prolong the duration of the stop *to any measurable degree*, beyond that reasonably necessary to quickly accomplish or complete the justified purpose of the stop with reasonable diligence. *Zeimer*, ¶ 45 (citations omitted); *Rodriguez*, 575 U.S. at 350 and 354-57, 135 S. Ct. at 1612 and 1614-16; *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 788 (2009);[13] *see also Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; *Terry*, 392 U.S. at 18-20, 88 S. Ct. at 1878-79.

---

[13] *Accord, e.g., Laster*, ¶¶ 3-4, 6, 40, and 48-49 (permissible duration or scope of initially lawful traffic stop not unlawfully expanded or prolonged by single incidental request for consent for unrelated vehicle search while waiting for extraction of vehicle from snow bank). *See similarly State v. Clark*, 2008 MT 419, ¶¶ 7-9 and 22-25, 347 Mont. 354, 198 P.3d 809; *State v. Snell*, 2004 MT 269, ¶¶ 3-5 and 16-17, 323 Mont. 157, 99 P.3d 191.

¶37    In *Rodriguez*, a Nebraska K-9 officer accompanied by his trained drug dog validly stopped a vehicle just after midnight after seeing it "veer slowly onto the shoulder" of the highway in violation of the Nebraska traffic code. *Rodriguez*, 575 U.S. at 351, 135 S. Ct. at 1612.  At the passenger side door, the officer encountered two male occupants, explained the reason for the stop, and asked why the driver was driving on the shoulder. *Rodriguez*, 575 U.S. at 351, 135 S. Ct. at 1613.  When the driver replied that he swerved to avoid a pothole, the officer demanded his driver's license, registration, and proof of insurance, and then returned to the patrol car. *Rodriguez*, 575 U.S. at 351, 135 S. Ct. at 1613.  After standard traffic stop records checks revealed no issues, the officer returned to the vehicle, asked the *passenger* for his driver's license, "and began to question him about where the two men were coming from and where they were going." *Rodriguez*, 575 U.S. at 351, 135 S. Ct. at 1613.  The passenger explained that they were returning to Norfolk, Nebraska, after looking at a car for sale in Omaha. *Rodriguez*, 575 U.S. at 351, 135 S. Ct. at 1613.  The officer then returned to his patrol car, ran a records check on the *passenger*, called for another officer, and began writing a warning ticket to the driver on the traffic violation. *Rodriguez*, 575 U.S. at 351, 135 S. Ct. at 1613.  The officer then completed the traffic enforcement purpose of the stop by returning to the vehicle, returning all documents to both men, and handing the driver a written traffic violation warning with explanation of the warning. *Rodriguez*, 575 U.S. at 352, 135 S. Ct. at 1613.  With "all the reasons for the stop" then "out of the way," the officer:

> asked for permission to walk his [drug] dog around [the driver's] vehicle. [The driver] said no. [The officer] then instructed [him] to turn off the ignition, exit the vehicle, and stand in front of the patrol car to wait for the

36

second officer. . . . [After the second officer arrived, the first officer conducted a walk-around dog sniff search upon which] [t]he dog alerted to the presence of drugs . . . . All told, seven or eight minutes had elapsed from the time . . . [of issuance of] the written warning until the dog indicated the presence of drugs. A [subsequent] search of the vehicle [yielded] a large bag of methamphetamine.

*Rodriguez*, 575 U.S. at 352, 135 S. Ct. at 1613 (internal punctuation and citations omitted).

On subsequent appeal, the United States Court of Appeals affirmed the resulting drug possession conviction on the stated ground that the additional 7-8 minute delay for the drug dog sniff was only a "*de minimis* intrusion" which did not unreasonably exceed or prolong the scope of the lawful purpose of the unrelated traffic stop under the investigative *Terry* stop exception. *Rodriguez*, 575 U.S. at 353, 135 S. Ct. at 1614 (emphasis original).[14]

¶38 On certiorari, however, the Supreme Court rejected the government's *de minimis* intrusion theory of Fourth Amendment reasonableness and reversed. *Rodriguez*, 575 U.S. at 354-57, 135 S. Ct. at 1614-16. The Court held that, in contrast to the "ordinary" traffic safety and enforcement "inquiries" justified as a "routine" incident of most traffic stops (i.e., brief checks for outstanding wants/warrants, driver's license and vehicle registration

---

[14] Under the Fourth Amendment, an exterior dog "sniff test" around a person, vehicle, or container in a public place by a trained drug-detection dog is not a constitutional "search" requiring probable cause or particularized suspicion of criminal activity because it constitutes only a brief and minimal intrusion on any individual privacy interest in those areas. *City of Indianapolis v. Edmond*, 531 U.S. 32, 52-53, 121 S. Ct. 447, 460 (2000) (Rehnquist, C.J., dissenting) (citing *United States v. Place*, 462 U.S. 696, 706-07, 103 S. Ct. 2637, 2644-45 (1983)). However, in contrast, such dog sniff tests *are* a constitutional search at least requiring an objectively reasonable particularized suspicion of the presence of illegal drugs under the greater individual privacy protection provided by Montana Constitution Article II, Sections 10-11. *State v. Tackitt*, 2003 MT 81, ¶¶ 20-22 and 31, 315 Mont. 59, 67 P.3d 295 (citing *State v. Elison*, 2000 MT 288, ¶¶ 49-51, 302 Mont. 228, 14 P.3d 456 (motor vehicle occupants have reasonable expectation of privacy under Montana Constitution Article II, Sections 10-11 regarding items concealed from view "behind or underneath seats, in trunks or glove boxes, or [by] other methods")).

status, and stolen/missing vehicle reports), other "measure[s] aimed at detecting evidence of ordinary criminal [activity]" unrelated to the constitutional justification for the stop (such as illegal drug activity) "lack[] the same close connection to roadway safety as the ordinary inquiries," and are thus "not fairly characterized as part of the officer's traffic mission" that justified the initial traffic enforcement stop. *Rodriguez*, 575 U.S. at 355-56, 135 S. Ct. at 1615-16. Noting the Circuit Court's reliance on *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11, 98 S. Ct. 330, 333 (1977) (government's "legitimate and weighty" interest in officer safety outweighs the *de minimis* additional intrusion of requiring a driver already lawfully stopped to exit the vehicle), the Supreme Court noted that:

> [u]nlike a general interest in criminal enforcement, . . . the government[] officer *safety interest* [*recognized in Mimms*] *stems from* the *mission of the stop itself*. [Because] [t]raffic stops are especially fraught with danger to police officers, . . . an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely[,] . . . [such as criminal record and outstanding warrant checks]. On-scene *investigation into other crimes*, however, *detours from that mission*. *So too* do *safety precautions taken in order to facilitate such detours*. Thus, even assuming that the imposition here was no more intrusive than the exit order in *Mimms,* the dog sniff *could not be justified on the same basis*. Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular.

*Rodriguez*, 575 U.S. at 356-57, 135 S. Ct. at 1616 (internal punctuation and citations omitted—emphasis added).

¶39    Further instructive here, the Supreme Court similarly rejected the government's argument that it is constitutionally reasonably for an officer to "incrementally prolong a stop" to investigate an unrelated matter "[as] long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains

38

reasonable in relation to the duration of other traffic stops involving similar circumstances." *Rodriguez*, 575 U.S. at 357, 135 S. Ct. at 1616. The Court reasoned that:

> [t]he Government's argument, in effect, is that by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation. . . . The *reasonableness* of a seizure, however, *depends on what* the *police in fact do*. . . . [T]he Government acknowledges that an officer always has to be reasonably diligent. . . . How could diligence be gauged other than by noting what the officer actually did and how he did it? *If an officer can complete traffic-based inquiries expeditiously*, then *that is the amount of time reasonably required to complete the stop's mission*. . . . [We] reiterate today[] [that] a traffic *stop prolonged beyond that point is unlawful*. The *critical question*, then, is not whether the [unrelated investigation] occurs before or after the officer issues a ticket [related to the reason for the stop], . . . but *whether* conducting [*the unrelated investigation*] *prolongs—i.e., adds time* to—the stop.

*Rodriguez*, 575 U.S. at 357, 135 S. Ct. at 1616 (internal punctuation and citations omitted—emphasis added).

¶40 Similarly, in *Zeimer*, we held that an investigating deputy sheriff unlawfully prolonged an initially valid DUI-based traffic stop when, instead of diligently proceeding to standard field sobriety testing to attempt to confirm or dispel the initial particularized suspicion that justified the stop, deputies extensively questioned the out-of-town driver at length for the purpose of investigating and attempting to develop or confirm their only generalized suspicion or hunch that he may or was about to be involved in an illegal drug transaction based on what they viewed as his suspicious overnight stay in his vehicle at an interstate truck stop and his odd and deceptive post-stop answers to their questions. *Zeimer*, ¶¶ 5-6, 8-12, 37, 40, 44, 46-47, and 50-52. The deputies based their only generalized suspicion or hunch on the defendant's "odd, inconsistent, and seemingly deceptive account of" his prior activities and his presence at the truck stop, the primary

39

deputy's perception that he "seemed nervous" and "suspiciously kept looking away and back at his truck for long periods of time" during questioning, and prior knowledge of his involvement in some other unspecified case. *Zeimer*, ¶¶ 37, 44, and 47. While we recognized "that otherwise perfectly legal or innocuous conduct or behavior *may* be a *contributing factor* in giving rise to a particularized suspicion of criminal activity *in conjunction with other specific indicia of criminal activity*," we further recognized, however, that "merely inconsistent accounts of a person's conduct or presence, nervous or defensive behavior when monitored or confronted by police, or the desire to avoid or evade oncoming police are insufficient [alone] to support a reasonable *particularized* suspicion of . . . criminal activity" without some more specific objective indicia "of some *particular* criminal activity." *Zeimer*, ¶ 50 (emphasis added—citations omitted).

¶41     Similarly, in *State v. Carrywater*, 2022 MT 131, 409 Mont. 194, 512 P.3d 1180, an experienced deputy sheriff's sergeant (deputy) saw a man he recognized pull into the parking lot of a Harlem, Montana, casino around 1:00 a.m. and walk in with his male passenger. *Carrywater*, ¶ 2. While waiting for dispatch confirmation of his belief that the driver (Grant) was the subject of an active Fort Belknap Indian Reservation warrant and did not have a valid driver's license, the deputy saw the two men shortly leave the casino with a woman, get into the car, and drive to a nearby ATM. *Carrywater*, ¶¶ 2-3. After briefly losing sight of the vehicle as he turned around to follow, the deputy saw that the vehicle was no longer at the ATM, and then later saw it turn onto U.S. Highway 2 toward the Reservation. *Carrywater*, ¶ 3. The deputy immediately pursued and stopped the vehicle based on his belief that the driver (Grant) was the subject of an arrest warrant and

driving without a valid license. *Carrywater*, ¶¶ 3, 16, and 22. However, before the deputy exited his patrol car, dispatch advised that the Reservation warrant was not extraditable and, on his approach on foot, the deputy found to his surprise that the former passenger (Carrywater), not Grant, was driving the car. *Carrywater*, ¶¶ 4 and 25. On further investigation, he then discovered that Grant's car was not insured, but that vehicle registration was valid, and Carrywater had a valid driver's license. *Carrywater*, ¶¶ 3-4.

¶42 Instead of proceeding to cite or arrest Grant for earlier driving with a suspended license, and citing either or both for driving without proof of liability insurance, the deputy detoured into an illegal drug investigation based on the fact that the men had suspiciously switched drivers, his awareness of "prior drug-related concerns" regarding both men from when he was a tribal police officer more than two years earlier, the suspicious nature of their late night in-and-out trip to the casino, his perceptions that both men appeared "nervous, fidgety, [and] a little uneasy," and his view that Carrywater's protruding "lower jaw" was a possible indicator of prior methamphetamine use. *Carrywater*, ¶¶ 5-6 and 21 (internal punctuation omitted).[15] Based on his undeveloped suspicion that the men were possibly involved in an illegal drug transaction, he returned to the vehicle, separated the men from each other, and separately questioned them about "where they were coming from and where they were going" and the purpose of their late night 60-mile round trip between

---

[15] Having apparently abandoned the traffic enforcement purpose that justified the stop, the deputy testified at hearing that his only "reason for remaining on the stop" after confirming that Carrywater had a valid driver's license was because the men had earlier "switched drivers" and the other asserted facts, *supra*, that were "possibly indicative" of illegal drug activity. *See Carrywater*, ¶¶ 4-5 (internal punctuation omitted).

41

Hays, Montana, and the Harlem casino. *Carrywater*, ¶ 6 (internal punctuation omitted). Finding their accounts suspicious and inconsistent with his observations, the deputy asked one of them "if there were any drugs, drug paraphernalia, or weapons in the vehicle." *Carrywater*, ¶¶ 6-7. After one denied the presence of any weapon, but the other said there was a gun in the car, the deputy stated that he wanted "to make sure nothing's being trafficked" and that "the pistol's legit," and then asked for and obtained Grant's consent to search his vehicle. *Carrywater*, ¶¶ 7 and 21. Subsequent non-consensual pat-down searches of both men, and a consensual vehicle search, yielded $3,000 in cash, a small bag of marijuana, a bag of methamphetamine, a handful of pills, and a marijuana pipe. *Carrywater*, ¶¶ 7-8.

¶43    In reversing the district court denial of a motion to suppress the drug evidence and Carrywater's resulting drug offense conviction, we held that the facts and resulting inferences articulated by the deputy were insufficient to establish the "particularized suspicion" of illegal drug activity required to justify expansion of the scope and duration of the initially valid stop for investigation of his undeveloped suspicion of illegal drug activity. *Carrywater*, ¶¶ 24 and 26-27. We held that the criminal inferences drawn by the deputy based on his articulated facts were "not the building blocks of particularized suspicion" of illegal drug activity, but merely "inferences based on inarticulable hunches attaching nefariousness to conduct entirely consistent with a law-abiding person" and lacking in any articulated facts that were "objectively" indicative of the suspected illegal activity. *Carrywater*, ¶¶ 26-27 (internal punctuation and citations omitted).

42

¶44     In *State v. Wilson*, 2018 MT 268, 393 Mont. 238, 430 P.3d 77, an MHP trooper stopped on the eastbound shoulder of U.S. Highway 2 in Blaine County, Montana, saw an oncoming eastbound car with a North Dakota plate pass by and the occupants "suspicious[ly]" "look[] away" immediately as they passed by. *Wilson*, ¶ 3. As in this case, the trooper was highly experienced with specialized illegal drug interdiction training and experience. *Wilson*, ¶ 42 (Rice, J., dissenting). As in this case, the trooper stopped the vehicle on a highway that spanned Montana from east-to-west upon observing a non-drug-related traffic offense (expired North Dakota vehicle registration). *Wilson*, ¶ 3. As in this case, the trooper asserted the U.S. Highway across Montana was a "known drug trafficking corridor." *Wilson*, ¶ 13. Like here, the trooper became further suspicious of illegal drug activity because: (1) the men were traveling across Montana between Idaho and North Dakota; (2) the driver supposedly was returning to North Dakota after getting married in Idaho, but oddly without his new wife; (3) the trooper's perception that the newlywed's explanation as to why he was traveling without his wife was odd or suspicious; (4) the driver was "suspicious[ly]" driving a car borrowed from a man he had known for less than 6 months with the driver surprised to learn that the registration was expired; (5) the vehicle had a "really weird" sticker on the rear window indicating that it may previously have been a rental car; (6) both men appeared to be extraordinarily nervous, the driver was "trembling" and "breathing heavily," and both were "avoiding eye contact;" (7) the interior of the vehicle appeared "somewhat lived in" and messy with "old food items" lying about; (8) a suitcase was visible in the back seat; (9) the driver "odd[ly]" "placed an unlit cigarette in[to] his mouth" as he walked back to the patrol car as directed

43

by the trooper; and (10) the driver "nervous[ly]" asked if he could get out of the patrol car and smoke while the trooper returned to the vehicle to ask the passenger to assist in locating an insurance card. *Wilson*, ¶¶ 4-9, 13, and 16. The passenger "corroborated" the driver's account of the trip details and why his new wife was separately returning to North Dakota, but criminal history checks and further questioning revealed that the driver had a history of prior drug charges and had most recently been on probation "for marijuana" two years prior. *Wilson*, ¶¶ 9-10. After exiting his patrol car and summoning a K-9 drug dog unit to the scene, the trooper returned and issued the driver two traffic citations (no insurance and expired vehicle registration) for violations discovered after the initial stop, and thus indicated that he was "good to go." *Wilson*, ¶¶ 11-13.

¶45 Like here, however, before the driver could get out of the patrol car, the trooper began questioning him further as to whether there were any drugs in the car (answer: no), for consent to search the vehicle (answer: no), and whether he would consent to an exterior drug dog sniff search around the vehicle (answer: no). *Wilson*, ¶¶ 13-14. Finding that all of the above-referenced circumstances were "compounding indicators" that illegal drugs were likely present in the car, the trooper detained the vehicle and, upon arrival of the K-9 unit, authorized an exterior drug dog sniff search which "alert[ed]" to the presence of illegal drugs in the vehicle. *Wilson*, ¶¶ 15 and 34 (internal punctuation omitted). Upon obtaining a search warrant, the trooper ultimately found two bags of marijuana in the trunk of the car (262.2 grams) and a small bag of marijuana and pipe in the center console. *Wilson*, ¶ 18. In subsequently reversing the district court's denial of a motion to suppress, we again recognized that, "[a]lthough a driver's post-stop behavior may, *in combination with* more

44

*objectively incriminating behavior*," *contribute to* an objectively reasonable particularized suspicion of criminal activity, the "compounding indicators" cited by the trooper were insufficient bases upon which to prolong the traffic stop for an unrelated drug investigation. *Wilson*, ¶¶ 34-35 (internal punctuation omitted—emphasis added). We noted that conspicuously lacking in the trooper's articulated factual observation and resulting inferences was any *objective indication* of the suspected presence of illegal drugs in the vehicle beyond nefarious inferences drawn by the trooper from the perfectly innocuous and legal conduct and circumstances articulated. *Wilson*, ¶¶ 34-35. Regardless of the nefarious inferences resulting from the trooper's specialized drug interdiction training and experience, we held that the articulated facts ("messy vehicle," extraordinarily nervous driver, odd or suspicious travel details, suspicious use of a borrowed vehicle, nervous use of unlit cigarette and desire to smoke, and "daylight use of a Montana highway" characterized as a "known drug trafficking corridor") were sufficient for no more than a generalized subjective "hunch" that illegal drugs may be present in the vehicle. *Wilson*, ¶¶ 13 and 34-35. We thus held that the trooper unlawfully expanded the scope and duration of the unrelated traffic stop beyond that reasonably necessary to complete its lawful purpose with reasonable diligence, i.e., the issuance of citations for the predicate traffic violations. *See Wilson*, ¶¶ 36-37 (citing § 46-5-403, MCA).

C. Analogous Noli Traffic Stop and Detour Into Illegal Drug Investigation.

¶46 Here, as in *Rodriguez*, *Zeimer*, *Carrywater*, and *Wilson*, the Trooper lawfully stopped Noli upon observation of a simple traffic code violation (left lane violation). As in *Rodriguez*, *Zeimer*, and *Wilson*, the lawful purpose and mission of the stop was thus

45

limited to checking for proof of insurance, conducting brief routine database checks (i.e.,

checks for driver's license and vehicle registration status and any law enforcement

wants/warrants or stolen/missing vehicle reports), and issuance of a corresponding

citation(s) or warning(s) on the subject traffic violation, and any related violation revealed

by those routine checks.[16]   Absent incidental observation or discovery of facts, and

objectively reasonable officer inferences, sufficient for an objectively reasonable

particularized suspicion of other criminal activity made in the course of performing and

completing those tasks in a reasonably diligent manner without unnecessary delay, the

lawful scope and duration of the traffic violation stop was limited to that necessary to

perform and complete those tasks in a reasonably diligent manner without unnecessary

delay.  *See Zeimer*, ¶¶ 31 and 51-52; *Carrywater*, ¶ 27; *Wilson*, ¶¶ 37-38 (citing § 46-5-403,

MCA); *Hoover*, ¶ 23 (citing *Hulse*, ¶¶ 40-42); *Meza*, ¶ 23; *Rodriguez*, 575 U.S. at 354 and

357, 135 S. Ct. at 1614 and 1616; *Johnson*, 555 U.S. at 333, 129 S. Ct. at 788; *Sharpe*, 470

---

[16] Subject to the broader protections of Montana Constitution Article II, Section 10, as may be applicable in a particular case, we recognize that "[t]raffic stops can be initiated based on probable cause or reasonable suspicion," and that "a stop based on probable cause affords an officer considerably more leeway" to make a "warrantless arrest of the driver" for the traffic violation, and then warrantless searches of the driver and vehicle under the search incident to arrest exceptions discussed in *Arizona v. Gant*, 556 U.S. 332, 335 and 339-44, 129 S. Ct. 1710, 1714 and 1716-19 (2009) (citations omitted).  *Rodriguez*, 575 U.S. at 365-66, 135 S. Ct. at 1621 (Thomas, J., dissenting).  *Compare Collins v. Virginia*, 584 U.S. ___, ___, 138 S. Ct. 1663, 1669-70 (2018) (noting multiple justifications for automobile search exception, authorizing warrantless search of automobile regardless of arrest upon probable cause that vehicle contains illegal contraband, as recognized in *Carroll v. United States*, 267 U.S. 132, 153-62, 45 S. Ct. 280, 285-88 (1925), and *California v. Carney*, 471 U.S. 386, 392-94, 105 S. Ct. 2066, 2069-71 (1985)).  Here, however, the State does not assert that the Trooper's articulated observation of probable cause, beyond mere particularized suspicion, of the subject traffic violation afforded him any additional constitutional leeway to expand or prolong the scope or duration of the stop to subject Noli, or her passenger, to a series of unrelated questions that *might possibly* be "indicators" of unrelated illegal drug activity.

46

U.S. at 686-87, 105 S. Ct. at 1575-76; *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; *Brignoni-Ponce*, 422 U.S. at 882, 95 S. Ct. at 2580; *Terry*, 392 U.S. at 18-20, 88 S. Ct. at 1878-79. Those constitutional requirements and limitations thus limited the lawful scope and duration of the initial traffic violation stop regardless of the State's generally compelling interest in the detection or investigation of unrelated illegal drug activity on Montana highways, the Trooper's purported desire to engage subjects in cordial conversation for the purpose of making it a better experience, or when he actually got around to conducting the routine database checks and issuing the subject traffic citation or warning. *See Zeimer*, ¶¶ 31 and 51-52; *Carrywater*, ¶ 27; *Wilson*, ¶¶ 37-38 (citing § 46-5-403, MCA); *Hoover*, ¶ 23 (citing *Hulse*, ¶¶ 40-42); *Meza*, ¶ 23; *Rodriguez*, 575 U.S. at 354 and 357, 135 S. Ct. at 1614 and 1616; *Johnson*, 555 U.S. at 333, 129 S. Ct. at 788; *Sharpe*, 470 U.S. at 686-87, 105 S. Ct. at 1575-76; *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; *Mincey v. Arizona*, 437 U.S. 385, 390 and 393, 98 S. Ct. 2408, 2412 and 2414 (1978); *Brignoni-Ponce*, 422 U.S. at 882, 95 S. Ct. at 2580; *Terry*, 392 U.S. at 18-20, 88 S. Ct. at 1878-79. Any measurable time taken by the Trooper for unrelated investigation or attempt to detect or develop facts sufficient for particularized suspicion of illegal drug activity was thus unlawful. *See Rodriguez*, 575 U.S. at 354 and 357, 135 S. Ct. at 1614 and 1616 (internal citations omitted). *See similarly Zeimer*, ¶¶ 31 and 51-52; *Carrywater*, ¶ 27; *Wilson*, ¶¶ 37-38 (citing § 46-5-403, MCA); *Hoover*, ¶ 23 (citing *Hulse*, ¶¶ 40-42); *Meza*, ¶ 23; *Sharpe*, 470 U.S. at 686-87, 105 S. Ct. at 1575-76; *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; *Brignoni-Ponce*, 422 U.S. at 882, 95 S. Ct. at 2580; *Terry*, 392 U.S. at 18-20, 88 S. Ct. at 1878-79.

¶47　From the moment that Noli produced her driver's license, the rental documentation, and compliantly joined him in his patrol car less than a minute into the stop, the Trooper, in accordance with his specialized illegal drug interdiction training and experience, detoured from the lawful traffic enforcement purpose and mission of the stop to investigate whether she may be transporting illegal drugs in her rented mini-van. After only brief pauses to complete routine database checks ordinarily incident to traffic stops, and then issue the contemplated left lane violation warning, the Trooper detoured from the lawful purpose and mission of the stop to subject Noli to multiple rounds of unrelated questioning, and then walk back to the mini-van to similarly question her isolated passenger, all for the manifest and acknowledged purpose of trying to observe and develop facts sufficient for a particularized suspicion of unrelated illegal drug activity. Despite the Trooper's hearing characterization of his unrelated patrol car questioning as merely "general conversation" to pass time while he completed his traffic violation enforcement action, Noli was not voluntarily sitting in his patrol car to engage in general conversation. She was sitting there at the direction of a uniformed law enforcement officer, manifestly not free to leave, and for the narrow purpose of receiving a traffic violation warning after he ran routine traffic stop database checks.[17] The record thus clearly manifests that, even if, *arguendo*, we

---

[17] Trooper Kilpela was recently engaged in similar "cordial conversation" as a means to detain a Vietnamese man suspected of being involved in illegal drug activity based on the Trooper's characterization of his behavior as extraordinarily nervous upon encountering law enforcement officers in a roadside gas station store, the man's mispronunciation of his purported destination city (Butte), and his prior involvement in illegal drug trafficking along the same highway. *State v. Pham*, 2021 MT 270, ¶¶ 4, 6, and 8-9, 406 Mont. 109, 497 P.3d 217. We held, however, that those articulated facts, and the Trooper's resulting nefarious inferences of illegal drug activity, were insufficient alone to establish an objectively reasonable particularized suspicion that the man was in fact then involved in illegal drug activity as suspected. *Pham*, ¶¶ 22-23 (noting that, while

agreed that he had particularized suspicion of illegal drug activity upon his return to the patrol car after questioning Noli's passenger, the Trooper had already unnecessarily and measurably delayed completion of the lawful purpose and mission of the traffic violation stop for 9-10 minutes for extensive questioning as part of an unrelated illegal drug investigation. Even then, however, as manifest by his even more pointed final round of questioning and cajoling of Noli upon return to the patrol car, the Trooper was not able to develop any objective indication, beyond his subjective nefarious inferences drawn from perfectly innocuous and legal behavior and circumstances, that Noli was involved in illegal activity until several minutes later, when he was finally able to induce her to equivocally admit that there might be a marijuana "joint" or "open beer" in the mini-van.[18] Thus, as in *Rodriguez*, *Zeimer*, *Carrywater*, and *Wilson*, the Trooper unlawfully detoured and measurably extended the scope and duration of the traffic violation enforcement purpose and mission of the stop to conduct a wholly unrelated illegal drug investigation without an objectively reasonable particularized suspicion that Noli was transporting illegal drugs as suspected.

¶48    Citing *Zeimer*, ¶ 45, the State asserts that the Trooper's unrelated patrol car questioning of Noli was nonetheless lawful because unrelated questioning regarding other

---

"[s]everal lawful instruments exist for officers to investigate potential crimes," "use of [those] devices without adequate cause" allows police "to target [citizens] in an arbitrary manner" and "risk[s] treating [them] as second-class citizens"—internal punctuation and citation omitted).

[18] As manifest in the foregoing patrol car colloquy, the Trooper induced her to equivocally admit that there might be a marijuana "joint" or "open beer" in the mini-van by telling her that he would not be concerned about a "joint," "a little bit of weed," "or something like that."

49

criminal activity is permissible as long as it does not substantially prolong the duration or completion of the purpose of the initial lawful stop. *Zeimer* recognized that:

> [u]pon a valid investigative traffic stop, unrelated questioning, including requests for proof of identification and checks for warrants, driver's license, vehicle registration, and insurance, *inter alia*, do not exceed the purpose, and reasonably-related scope and duration of the investigation of the underlying purpose of the stop as long as the unrelated questioning or checking does not substantially prolong the duration of the stop beyond that reasonably necessary to diligently dispel or exhaust the predicate particularized suspicion of criminal activity that justified the stop.

*Zeimer*, ¶ 45 (citing *State v. Laster*, 2021 MT 269, ¶ 49, 406 Mont. 60, 497 P.3d 224, and *Rodriguez*, 575 U.S. at 354-57, 135 S. Ct. at 1614-16—internal punctuation omitted). However, *Zeimer*, ¶ 45, was underpinned by *Laster*, ¶ 49, where we recognized that a *single* "*incidental question* about an unrelated matter, or request for consent to conduct an unrelated search" "neither unlawfully expands the permissible duration or scope" of an initially lawful stop, "nor effects a new seizure of the subject, as long as the unrelated question or request itself does not substantially prolong the duration of the stop." *Laster*, ¶ 49 (citations omitted—emphasis added). Here, the Trooper's extensive questioning of Noli regarding unrelated matters far exceeded in scope and duration the single incidental request for consent to search at issue in *Laster*.

¶49 Moreover, the cited language from *Zeimer*, ¶ 45, expressly referred to the type of routine checks ordinarily associated with traffic stops (e.g., "checks for warrants, driver's license, vehicle registration, and insurance, *inter alia*")—not the extensive unrelated drug investigation questioning later held in *Zeimer* to have unlawfully extended the scope and duration of the initially justified DUI stop regarding other criminal activity. *Zeimer*, ¶¶ 45

50

and 51-52. The cited language from *Zeimer* was also underpinned by *Rodriguez* which clearly distinguished between the type of permissible routine checks ordinarily associated with traffic stops from the investigation of unrelated criminal activity that is impermissible without independent particularized suspicion. *Rodriguez*, 575 U.S. at 354-57, 135 S. Ct. at 1614-16. *Zeimer* thus provides no support for the State's proposition here.

¶50 In response to defense criticism of the Trooper's asserted officer safety justification for directing Noli to join him in his vehicle as a ruse to isolate her for investigation of unrelated drug activity, the State cites *State v. Bailey*, 2021 MT 157, ¶ 37, 404 Mont. 384, 489 P.3d 889 (citing *Mimms*, 434 U.S. at 111, 98 S. Ct. at 333 (holding that the government's "legitimate and weighty" interest in officer safety outweighs the *de minimis* additional intrusion of requiring a driver already lawfully stopped to exit the vehicle)), as "instructive" authority justifying this practice. In *Bailey*, on a dark and cold winter night on a snow-packed and rutted remote two-lane road, an investigating MHP trooper responded to a single-vehicle roll-over accident report, in which the caller reported seeing vehicle damage and beer cans strewn about the scene, the trooper observed the damaged vehicle attempting to leave the scene, and noted circumstances inconsistent with the driver's subsequent account of the accident. *Bailey*, ¶¶ 2-5. On appeal, we recognized that he initially had sufficient particularized suspicion to justify the initial traffic stop to investigate and address an apparent traffic code violation and possible DUI. *See Bailey*, ¶¶ 6 and 36. We recognized further that directing the driver to temporarily sit in the patrol car for questioning regarding the accident and possible DUI was a reasonable restriction of his liberty within the lawful scope and purpose of the stop based on the trooper's

particularized suspicion regarding those matters, and his secondary desire to get himself and the driver out of the cold into an environment more conducive to those purposes. *See Bailey*, ¶¶ 6, 25-26, 29, and 36-37 (citing *Rodriguez*, 575 U.S. at 354, 135 S. Ct. at 1614 (noting officer's mission during traffic stop is to address the reason that warranted the stop and "attend to related safety concerns"), and *Mimms*, 434 U.S. at 111, 98 S. Ct. at 333 (holding that the government's "legitimate and weighty" interest in officer safety outweighs the *de minimis* additional intrusion of requiring a driver already lawfully stopped to exit the vehicle)).

¶51 However, unlike here, the distinct focus of our pertinent holding in *Bailey* was on whether the demand for the driver to sit in the locked backseat area of the patrol car for questioning *regarding the lawful purposes of the stop* was effectively, or tantamount to, a formal arrest, thus rendering the patrol car questioning an un-*Mirandized* custodial interrogation. *See Bailey*, ¶¶ 32-39. While we implicitly recognized the validity of the officer/driver safety justification recognized in *Rodriguez*, 575 U.S. at 356, 135 S. Ct. at 1615-16, and *Mimms*, 434 U.S. at 111, 98 S. Ct. at 333, *supra*, for directing the subject of a lawful stop to exit the subject vehicle, and even join the officer in the patrol car, for questioning related to the lawful purpose of the stop, we did so under the particular factual circumstances at issue in that case—in the context of a valid investigative stop on particularized suspicion of a traffic violation and DUI which justified related investigative questioning of the driver, and articulated officer safety concerns regarding outside, roadside questioning of the driver under the described inclement weather and road conditions. *See Bailey*, ¶¶ 2-5 and 37-39.

¶52 In contrast, here, the patrol car video clearly manifests that the subject stop occurred in only sparse traffic on a bright, sunny, and clear February day where the Trooper stopped Noli on a bare, dry, lined, and paved shoulder on a relatively remote segment of Interstate 94 between Terry and Glendive, Montana. Other than a passing reference to the safety of himself and Noli in response to the prosecutor's leading question at hearing, the Trooper offered no particular safety justification for directing Noli to join him in his patrol car. Moreover, the patrol car dash cam recording and hearing transcript clearly manifest that, unlike in *Bailey*, the Trooper did not ask Noli to join him for patrol car questioning regarding the lawful purpose of the lane violation stop, but for the purpose of engaging her in unrelated questioning or "conversation" intended to reveal facts that might eventually support a particularized suspicion of illegal drug activity. Moreover, aside from the point of law that purported "safety precautions taken in order to facilitate" unrelated investigative "detours" from the lawful purpose of a traffic stop exceed the lawful scope and duration of the purpose or "mission" that justified the stop, *Rodriguez*, 575 U.S. at 356-57, 135 S. Ct. at 1616, Noli does not assert that the Trooper unlawfully directed her to sit in his patrol car regarding the *stated* purpose of the demand, i.e., to run standard database checks ordinarily associated with traffic stops and issue her a warning on the traffic violation. Unlike in *Bailey*, the issue here is whether what occurred *after* Noli sat in the patrol car unlawfully prolonged the stop for investigation of an unrelated matter. Thus, neither *Bailey*, nor *Mimms*, are instructive or of any other consequence here.

¶53 Without analysis or affirmative endorsement, the State further puts forth the District Court's reasoning that "the facts in this case" are more analogous "to those in *State v.*

53

*Hurlbert*, 2009 MT 221, 351 Mont. 316, 211 P.3d 869, and *State v. Estes*, 2017 MT 226, 388 Mont. 491, 403 P.3d 1249, than those in *Wilson*," *supra*. The District Court noted *Hurlbert* and *Estes* as examples of cases where we have affirmed lower court findings that nefarious illegal drug activity inferences drawn by MHP drug interdiction officers from daisy-chained collections of post-stop observations of lawful behavior and circumstances were sufficient to support a particularized suspicion of illegal drug activity. *See Hurlbert*, ¶¶ 7-8 and 22-23 (affirming district court finding of particularized suspicion of illegal drug activity where driver stopped for speeding appeared "nervous," was "definitely shaking," "sweating quite a bit," "constantly moving around" and "uneasy," "rapidly smoking a cigarette," "would open up his wallet and just stare at it," and "had been visiting his parents in Bozeman" but "could not provide an address" for their home—internal punctuation omitted); *Estes*, ¶¶ 3, 18, and 20 (affirming district court finding of particularized suspicion of illegal drug activity where driver stopped for expired North Dakota vehicle registration did not own the vehicle, was traveling alone, appeared "inordinately nervous" and "visibly shaking" disproportionate to expired registration violation, had "food wrappers and energy drink bottles strewn around" the vehicle indicating that he "wanted to get from point A to point B quickly," and had "numerous air fresheners" in the vehicle which are "often used to mask illicit drug odors").

¶54 However, we have twice distinguished *Estes* as having at least two objective indicia of illegal drug activity *in addition to* the increasingly common laundry list, or MHP profiling, of otherwise innocuous and perfectly legal post-stop behavior and circumstances asserted as contributing "indicators" of illegal drug trafficking activity (such as

messy/"hard travel," extraordinary nervousness, eye contact avoidance, odd travel details, and other lawful behavior generally perceived as suspicious, deceptive, or evasive): a driver traveling alone with 2 cell phones and cash clearly visible on the center console with an uncommon number of vehicle air fresheners in the vehicle. *See Carrywater*, ¶¶ 20 and 26 (citing *Estes*, ¶¶ 3 and 18); *Wilson*, ¶¶ 29-31 and 35 (citing *Estes*, ¶¶ 18-20). In comparison to the facts at issue in *Zeimer*, *Carrywater*, and *Wilson*, *supra*, those distinguishing facts in *Estes* were at least minimally sufficient as at least some *objective* indicia of illegal drug activity due to the common illegal use of such articles in combination, and in contrast to their uncommon combined occurrence in ordinary life.[19]

¶55    As to *Hurlbert*, we recognize that our analysis, perhaps anomalously, was completely lacking in identification of any objective indicia of illegal drug activity beyond subjective officer inference assigning criminal intent or affect to perfectly innocuous and legal behavior and circumstances. *See Hurlbert*, ¶¶ 22-23. We have nonetheless more consistently recognized that, while "[s]imply attaching inferences of nefariousness" to a

---

[19] *See similarly State v. Roy*, 2013 MT 51, ¶¶ 17-18, 369 Mont. 173, 296 P.3d 1169 (post-stop observations by highly experienced illegal drug interdiction officer of indications of "a long road trip, such as clothing, luggage, and garbage strewn throughout the vehicle," and "a heavy odor of vehicle deodorizer" commonly used as marijuana masking agent sufficient for objectively reasonable particularized suspicion of illegal marijuana possession where accompanied by police-corroborated informant tip that similar vehicle with particular sticker in window was enroute to Billings on Interstate 90 to arrive around 10:00 p.m.); *State v. McMaster*, 2008 MT 294, ¶¶ 15-23, 345 Mont. 408, 191 P.3d 443 (a series of odd but innocent actions at Town Pump store sufficient to contribute to a particularized suspicion of illegal drug activity in conjunction with articulated police knowledge that subject was a major out-of-town drug dealer, the store "was a location known for drug deals," experienced officer observations of defendant's "erratic driving" like he was looking to meet somebody outside of town, multiple individuals outside their vehicles "rubber-necking" at or for police before exchanging a box).

string of otherwise innocuous and legal conduct, behaviors and circumstances may be sufficient to support a generalized, undeveloped, inchoate, or subjective suspicion or hunch, it is insufficient by definition to support an objective particularized suspicion of any particular criminal activity "[w]hen the only basis for suspecting a specific person of wrongdoing is inferences that could be drawn from the conduct of virtually any law-abiding person." *Reeves*, ¶ 13; *see also*, *e.g.*, *Zeimer*, *Carrywater*, *Wilson*, and *Estes*, *supra*.[20] Further, here, not even the Trooper asserted that he had particularized suspicion of illegal drug transportation until after he returned to his patrol car after questioning Noli's girlfriend. By that time, regardless of the fact that he had yet to issue the contemplated left lane violation warning to Noli, he had extensively questioned her and her passenger for at

[20] *See similarly State v. Harning*, 2022 MT 61, ¶¶ 2-9, 19-26, and 28-29, 408 Mont. 140, 507 P.3d 145 ("sealed cardboard boxes" in truck bed, smell of marijuana smoke, admission to prior use of marijuana in town 80 miles away without indication of impairment, suspicious refusal to roll window down more than 3-4 inches suggesting "evasive" behavior and attempt to hide something, appearance of extraordinary nervousness and discomfort, "hemm[ing] and haw[ing]," pensive thought before answering questions and careful picking of words "not normal of someone being honest," and that people stopped for traffic violations "don't act like that" insufficient for particularized suspicion that vehicle contained illegal drugs absent articulation of some other "objective" indicia that illegal drugs were present in vehicle); *State v. Broken Rope*, 278 Mont. 427, 428-33, 925 P.2d 1157, 1157-60 (1996) (subjects lingering and "moving around in [a convenience] store's parking lot" on police arrival, "staring at" police, appearing "nervous" when watched by police, and using pay telephone not "inherently suspicious" or objectively indicative of illegal drug activity—"many law-abiding citizens may well be nervous" when police are watching "their activities"); *United States v. Santiago*, 310 F.3d 336, 337-39 and 342 (5th Cir. 2002) (shaking hands and "extreme nervousness" on Louisiana Interstate 20 traffic violation stop, odd and conflicting accounts of reason for the trip, apparent difficulty in recalling name of accompanying woman purported to be his wife, vehicle registered to driver and a different woman purported to be ex-wife, driver resided near a Mexican border location known to officer as a methamphetamine source, Atlanta destination was known methamphetamine destination point, and resulting officer suspicion that driver and female passenger were "trying to conceal something" and were in possession of illegal drugs insufficient for objective particularized suspicion of illegal drug activity).

least 9-10 minutes about unrelated matters manifestly and admittedly related to an illegal drug activity investigation. As clearly proscribed in *Rodriguez*, the Trooper substantively detoured from and measurably prolonged the stop beyond the lawful purpose and mission that justified it, even before the point at which he asserted that he developed sufficient information to support a particularized suspicion that illegal drugs may be present in the mini-van. No similar delay was at issue in *Hurlbert*. *Hurlbert* is thus clearly distinguishable and of no consequence here.

¶56    Finally, even if we assume, *arguendo*, that the Trooper's extensive questioning regarding an unrelated drug investigation did not earlier sidetrack and unreasonably expand and prolong the lane violation traffic stop, his high quality rear-facing dash cam recording largely contradicts his subjective hearing recollections regarding Noli's appearance and behavior. It manifests that, up until after he began more pointedly questioning her about whether there were any illegal drugs in her vehicle after finally warning her for the lane violation and telling her she was "good to go," Noli was calmly sitting in the patrol car passenger seat, looking forward at oncoming and passing freeway traffic, slightly leaning on her right elbow at the base of the passenger side window, and with her head at times resting on the extended fingers of her right hand on her right temple. Aside from an expression of aggravated impatience on her face, and occasional relocation and stroking/rubbing of the area on or around her left eyebrow, left side of her face, and the top of her head, the recording indicates no lack of attention, shortness of breath, accelerated breathing, excited or extraordinary speech pattern or tone, or other indication of nervous behavior, much less extremely nervous behavior. Contrary to the Trooper's hearing

57

characterization, the recording manifests that Noli frequently turned to face him and make eye contact when speaking to him or he was speaking to her, particularly when he looked up and at her from making notes or looking at his computer. The recording further manifests, contrary to the Trooper's hearing testimony, Noli speaking in a calm, deliberate, articulate, and thoughtful manner, attentively listening and interactively responding to his extensive questioning. The recording also manifests that the oft-informal manner of Noli's speech, and often incomplete or choppy sentence structure, was no worse than that exhibited by the Trooper.

¶57     Except for her mispronunciation of "Williston" as "Willington," uncertainty as to what other North Dakota communities were near Williston, reliance on Google Maps for navigation of the apparently unfamiliar route between Las Vegas and Williston, and occasional thoughtful pauses in answering the Trooper's questions, the recording manifests no indication of uncertainty or confusion, whether as to her prior criminal record, her current or prior employment, whether and where she and her partner intended to stay the night in Williston, where they were going, why they were going there, when they left Las Vegas, where they stayed overnight along the way, how long they had been on the road, or when they planned on leaving Williston to return to Las Vegas. Contrary to the District Court's finding that "[she] was unable to identify the location she had stayed the night before," the dash cam recording manifests that she told the Trooper that they stayed at a motel in a "little city" "right before Idaho Falls," Idaho, before getting up and back on the road the next morning (i.e., the day of the stop). The recording also clearly manifests that, contrary to the Trooper's testimony and District Court findings, Noli was more than able

58

and willing to clearly answer simple questions, compliant and cordial, not confused about any significant detail, and did not appear to be extremely nervous or under extreme, "heightened," or "escalating stress."

¶58 Further, while the Trooper testified that he found it suspicious that Noli put her arm down over the rolling papers on the center console as she reached across to hand him her driver's license, he admitted under further questioning that he was "not sure" whether she put her arm down to conceal the rolling papers or merely to "brace" herself as she reached across the center console. Noli's statement to the Trooper of their intent to stay overnight in Williston, North Dakota, and then start driving back to Las Vegas the next day, was not patently or necessarily inconsistent with her passenger's statement that they were going straight there and then right back. At most, the passenger's statement was vague or ambiguous in comparison to Noli's statement, and the Trooper did not ask the passenger to clarify or elaborate.

¶59 Moreover, the Trooper's reliance on the asserted fact that drug traffickers often use rental cars to transport illegal drugs to infer that Noli may have been transporting illegal drugs did not contradict her perfectly reasonable, uncontradicted, and unchallenged assertion, as acknowledged by the Trooper, that she used a short term car rental to allow her and her girlfriend to drive from Las Vegas to North Dakota to bring back two younger siblings without putting undue mileage on her own car. Nor did the Trooper state at hearing that he had any particular reason, beyond subjective inference from innocuous facts, to believe that her statement was not truthful. Nor is the presence of blankets, pillows, and unspecified and unquantified "trash" in the back seat of Noli's mini-van necessarily, or

59

even likely, more indicative of drug trafficking related "hard travel," rather than the simple and common fact that such items are common to people engaged in long distance highway travel. Likewise, the presence of cigarette rolling papers acknowledged by the Trooper to be a legal commodity commonly used for smoking both tobacco and marijuana. While he testified to smelling a heavy odor of tobacco smoke, and seeing Noli's girlfriend smoking a commercial cigarette in the mini-van, he did not smell any marijuana odor or smoke. Nor did he see or notice any other indicia of marijuana or marijuana use. The State further made no assertion, much less showing, as to whether or to what extent the possession of small quantities of marijuana were even then illegal in Nevada, Montana, or other States traversed by Noli along the way.

¶60     Similarly weak is the asserted probative value of the heavy odor of cigarette smoke noticeable at the open passenger side window of the mini-van as an "indicator" of the presence of an illegal quantity of marijuana or other unspecified illegal drug. We have recognized and accept as true experienced officer testimony that drug traffickers often use uncommonly large numbers of vehicle air fresheners, or uncommonly strong air freshener odor, to mask the smell of large quantities of marijuana or other illegal drugs in vehicles. *See Estes* and *Roy*, *supra*. However, heavy cigarette smoke odor in a vehicle interior is a different matter. It is irrefutably common in our society for heavy or frequent smokers, or multiple persons, to smoke in vehicles while in highway transit. Consequently, unlike uncommonly strong vehicle air freshener odors, heavy cigarette smoke odor is no more an uncommon occurrence or objective "indicator" of the presence of illegal drugs in a vehicle stopped on a long road trip than fast food wrappers, paper sacks, and soft drink cups. For

60

the same reason, as in *Wilson*, ¶¶ 5, 8, and 34-35, the Trooper's subsequent observation of Noli's girlfriend beginning to smoke, taking a long "drag" on her cigarette, and not maintaining eye contact with him when he returned to the vehicle to speak with her alone were no more an objective manifestation of consciousness of illegal drug possession than that she was a regular or heavy smoker and fearful, apprehensive, or uncomfortable about being questioned alone by a police officer about illegal matters unrelated to a purported traffic violation stop.

¶61 Lastly, as recognized in *Wilson*, ¶¶ 13 and 34-35, the Trooper-asserted facts that Las Vegas is a known illegal drug source, North Dakota is a known illegal drug destination, and the highway route between them is therefore a known illegal drug trafficking corridor is unfortunately not uncommon to Las Vegas, North Dakota, or any particular highway across Montana or other state in the Union. Those asserted facts, and the Trooper's asserted inference, could commonly apply to almost any highway across Montana between almost any major urban area south, west, or east of Montana and any location in Montana, North Dakota, or neighboring rural states.

¶62 Once again, we recognize that "otherwise perfectly legal or innocuous conduct or behavior may be a contributing factor" in support of "a particularized suspicion of criminal activity," but only "in conjunction with other specific indicia of criminal activity." *Zeimer*, ¶ 50 (citations omitted); *Wilson*, ¶ 34. An objectively reasonable particularized suspicion of criminal activity sufficient to initiate or prolong a warrantless investigative stop requires *at least* "*some objective manifestation*" that the subject "is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417, 101 S. Ct. at 695 (citing *Terry*, 392 U.S. at

61

16-19, 88 S. Ct. at 1877-79, *inter alia*—emphasis added); *see also Hoover*, ¶ 17 (citations omitted). "[T]his demand for *specificity* in the information upon which police action is predicated" is the essential justification and requirement for the *Terry* investigative stop exception. *See Cortez*, 449 U.S. at 418, 101 S. Ct. at 695 (quoting *Terry*, 392 U.S. at 21 n.18, 88 S. Ct. at 1880 n.18—emphasis added). An objective particularized suspicion of criminal activity thus requires even a highly trained and experienced officer to articulate *some objective fact* manifesting under the totality of the circumstances that a particular person is or is about to be engaged in some particular criminal activity. *Hoover*, ¶ 17 (citations omitted); *Cortez,* 449 U.S. at 417, 101 S. Ct. at 695 (citing *Terry*, 392 U.S. at 16-19, 88 S. Ct. at 1877-79, *inter alia*). Here, not until after further extensive unrelated questioning, well after he had already expanded and delayed completion of the lane violation purpose of the stop for at least 9-10 minutes, did the Trooper eventually induce Noli to make a statement, albeit equivocal, constituting the first objective manifestation or indication of illegal drug activity. Until then, as in *Zeimer*, *Carrywater*, *Wilson*, and *Santiago*, *supra*, the specially trained and experienced drug interdiction Trooper's articulated suspicion of illegal drug transportation was no more than a chain of nefarious inferences, subjectively drawn from a collection of articulated behavior and circumstances that were all perfectly innocuous and legal in nature, but for his own highly subjective nefarious inferences. The articulated facts and circumstances, and resulting nefarious inferences drawn by the Trooper, were thus sufficient for no more than a generalized and as yet undeveloped suspicion or hunch, based on his specialized drug interdiction training and experience, that Noli was transporting illegal drugs. The fact that the Trooper later

found illegal drug evidence in the vehicle has no legal bearing on whether he had legal justification to detain Noli on a traffic violation stop long enough to extensively question her to try to confirm that undeveloped suspicion. *See State v. Harning*, 2022 MT 61, ¶ 24, 408 Mont. 140, 507 P.3d 145 (noting temptation "to forgive an officer's illegal extension of a stop" when it leads to discovery of evidence of illegality, but that such temptation "belies the basic principle at the heart of search and seizure jurisprudence"—citation omitted); *State v. Ribera*, 183 Mont. 1, 6, 597 P.2d 1164, 1167 (1979) (if constitutional justification for the seizure or search was lacking, "no evidence discovered as a result of a search of defendant can be used to justify the [antecedent seizure or search]"—citation omitted).

¶63     To the extent that it narrowly focused on whether the Trooper articulated sufficient particularized suspicion of illegal drug activity justifying expansion of the scope and duration of the stop *after* he returned to the patrol car from questioning Noli's passenger, the District Court erroneously applied the pertinent law and failed to assess whether he earlier unlawfully extended the duration and scope of the lane violation stop to conduct an unrelated drug investigation. Even to the extent that it found that the Trooper eventually developed particularized suspicion of illegal drug activity, the District Court misapprehended the effect of the evidence by disregarding the conflicting facts manifest on the high quality dash cam recording, and erroneously applied the law by failing to recognize that particularized suspicion of criminal activity requires at least some objective manifestation or indicia of the suspected criminal activity beyond a collection of totally innocent, innocuous, and legal facts. Under the particular record circumstances in this

case, we hold that the Trooper detoured into an unrelated illegal drug investigation without objective particularized suspicion of such activity and which measurably, and thus unlawfully, extended the scope and duration of the stop beyond that necessary to investigate and complete the lawful purpose and mission of the traffic violation that justified the initial stop.

## CONCLUSION

¶64 We hold that the District Court erroneously denied Noli's motion to suppress the illegal drug evidence discovered pursuant to a subsequent consent search of her vehicle. The District Court's 2019 order denying Noli's motion to suppress evidence, and resulting 2020 judgment of conviction and sentence on the offenses of criminal possession of dangerous drugs and criminal possession of drug paraphernalia, are hereby reversed.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON